## Case No. 8,772.

### In re MACDONNELL.

[11 Blatchf. 170; [1] 18 Int. Rev. Rec. 11; 5 Leg. Gaz. 236; 5 Leg. Op. 105.]

Circuit Court, S. D. New York. June 3, 1873.

EXTRADITION — SECOND WARRANT OF ARREST — FOREIGN WARRANT AND CERTIFICATE — HABEAS CORPUS — CERTIORARI — SUFFICIENCY OF EVIDENCE BEFORE COMMISSIONER.

1. Observations on the power of the court to issue a writ of certiorari, in a case under a

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

treaty providing for the extradition of fugitives, and on the effect of a warrant of surrender, issued by the president, as a supersedeas of such a writ.

2. While the relator was lawfully held in custody, under a valid warrant of arrest, in an extradition case, and the inquiry thereunder was being proceeded with, a second warrant, on a new complaint, for a distinct offence, for his extradition, was issued. Afterwards, he was discharged from the arrest under the first warrant, for want of sufficient evidence to justify his commitment, and he was thereafter arrested under the second warrant: *Held*, that the latter arrest was not invalid.

3. Under section 2 of the act of August 12, 1848 (9 Stat. 302), as supplemented by the act of June 22, 1860 (12 Stat. 84), copies of depositions taken in London, before the lord mayor of London, and certified under his hand to be copies of the depositions on which he issued a warrant of arrest against the person charged, and further certified by the minister of the United States in Great Britain to be so authenticated as to entitle them to be received for similar purposes by the tribunals of Great Britain, are competent evidence in an inquiry under a warrant of arrest, in an extradition case.

4. A court, or a judge, issuing a writ of habeas corpus, in an extradition case, does not sit as an appellate tribunal, to review the proceedings which have taken place before a commissioner, as upon allegation of error.

[Cited in U. S. v. Brawner, 7 Fed. 87; Re Wadge, 15 Fed. 866; Ex parte McCabe, 46 Fed. 366.]

5. If the commissioner acquired jurisdiction of the subject-matter, and of the prisoner, the prisoner may be legally held, although the commissioner, in conducting the inquiry, committed an error in the reception of evidence.

6. The adjudications in this circuit considered, as to the power and duty of the court, on habeas corpus and certiorari, to entertain the question of the sufficiency of the evidence before the commissioner, to warrant the commitment for surrender.

[Cited in Ex parte Perkins, 29 Fed. 908; Re Ezeta, 62 Fed. 982.]

7. No case has held that, because some evidence was introduced which was not legal or competent, or because the court, upon a review of the evidence, was of opinion that it would have come to a different conclusion upon the evidence, therefore the proceedings were illegal, and the prisoner should be discharged.

[Quoted in Re Stupp, Case No. 13,563.]

This case came before the court on the 2d of June, 1873, on writs of habeas corpus and certiorari. The prisoner [George Macdonnell], was produced by the marshal, in obedience to the writ of habeas corpus addressed to him, returnable to this court. By the return to the writ it appeared, that the prisoner was held in custody under a warrant issued by United States Commissioner Gutman, committing him to the custody of the marshal, for surrender to the authorities of Great Britain, pursuant to the treaty of August 9, 1842 (8 Stat. 572), upon a charge of sundry specified forgeries, and the utterance of forged paper; and that, since the issuing of the writ, a warrant from the secretary of state of the United States had been received by the marshal, directing him to surrender the prisoner to the agents of the British government. The said commissioner, to whom

the writ of certiorari was addressed, returned a copy of the proceedings had before him, upon which he made the commitment of the prisoner for surrender, and that he had made his report of the proceedings to the executive of the United States, upon which the warrant of the secretary of state had since issued. The prisoner had previously been proceeded against, pursuant to a requisition of the British government, and a mandate of the executive issued thereupon, on the 13th of March, 1873, under a complaint made before the same commissioner, March 18th, 1873, charging the crimes of forgery and the utterance of forged paper, to wit, certain two bills of exchange, for £1,000 each, on which a warrant was issued by him on that day. Under that warrant the prisoner was arrested and held. The proceedings upon that complaint were continued until the 24th of April, 1873. In the meantime the validity of the proceedings had been examined, under writs of habeas corpus and certiorari [Case No. 8,771], before Judge Woodruff, and their validity affirmed, and the prisoner returned to the custody of the marshal. On the 23d of April, 1873, a second warrant of arrest was issued by the same commissioner, founded upon another mandate of the executive, issued on the 8th of April, 1873, and another complaint made to the commissioner by the British consul-general, charging the prisoner with the crimes of forgery and the utterance of forged paper, to wit, with forging and uttering eleven separate bills of exchange, which were particularly described, with date, time, place, amount, &c., &c. Such warrant of arrest was delivered to the marshal on the same day, April 23d, and the prisoner (then in custody under the prior warrant) was notified thereof. On the 24th of April, the counsel conducting the prosecution under the first proceedings announced to the commissioner that they had no further evidence to offer under such previous proceedings, and the commissioner thereupon, deeming the evidence then before him insufficient to justify a commitment, discharged the prisoner from the said prior warrant of arrest. The prisoner was, however, detained by the marshal under and by virtue of such second warrant of arrest, and proofs were thereupon taken, which resulted in the warrant of commitment for surrender under which he was held to await the action of the executive, at the time the present writ of habeas corpus was issued, which warrant of commitment was soon after followed by the warrant for his surrender to the agents of the British government, mentioned in the return to the writ. The prisoner answered the return to the habeas corpus, insisting therein upon the illegality of the proceedings, the discharge from the former arrest, as an acquittal, the errors of the commissioner in admitting incompetent evidence, and the insufficiency of the proof to warrant his commitment, and claiming to be discharged from custody. Some other facts,

and the grounds urged by his counsel in support of his claim to be discharged, appear in the observations of the court in announcing the decision.

Charles W. Brooke, for prisoner.

Clarence A. Seward and Charles M. Da Costa, for Bank of England.

Francis F. Marbury, for British consul.

James C. Carter, for marshal.

Before WOODRUFF, Circuit Judge, and BLATCHFORD, District Judge.

WOODRUFF, Circuit Judge (on the 3d of June, the counsel for the prisoner having been fully heard on the previous day), stated the conclusions of the court, orally, as follows:

The court have given such attention to this case, during the progress of the argument, and in the interval since the adjournment, as seemed to us due to its importance, to the earnestness and zeal with which the claims on behalf of the prisoner have been urged upon our attention, and to the gravity of some of the questions which have been agitated—such as seemed to us to be necessary to a safe and right conclusion upon the questions involved, having due regard, also, to the rights of the citizen, and a proper respect to the foreign government, and the good faith of our own, in the execution of its treaty. The result is, that we do not think it necessary to hear the counsel for the prosecution, upon the questions either of law or of fact, which were raised and discussed herein by the counsel for the prisoner. Nor do we think it necessary, on this occasion, at least, to consider the grounds upon which the court is moved, in behalf of the prosecution, to quash the writ of certiorari. Ex parte Van Orden [Case No. 16,870]; In re Martin [Id. 9,151].

The conclusions which we have reached upon the points urged in behalf of the prisoner, render it unnecessary that we should say anything of the power of the court to issue the writ of certiorari, in a case arising under a treaty providing for the extradition of fugitives, or of the effect of the warrant of the president for the surrender of the prisoner, upon the proceedings, as a supersedeas, if a writ of certiorari has been properly issued. It is, however, proper to say, that the power to issue such a writ, in cases of this description, has been frequently affirmed and exercised; and that the warrant of surrender, issued by the government of the United States, for the delivery of the prisoner to the agents of the demanding government, has not, so far as we can discover, or are advised, been heretofore held a conclusive bar to further inquiry into any questions which may properly be raised upon a return of the whole proceedings. On that subject we go no further, because, assuming that the writ was properly issued, and that the warrant for the surrender of the prisoner should have no ef-

fect to preclude further inquiry, and no effect to render valid proceedings which could not otherwise be sustained, our conclusion is, that the grounds upon which the discharge of the prisoner is sought under these writs, ought not to prevail.

Without discussing all the questions that have been raised by counsel, at great length, or attempting to review all the arguments, or seeking to array against them, in any considerable detail, reasons for not giving them the force which they seem to possess in the mind of the counsel by whom they were urged, we shall content ourselves with disposing of the objections substantially in the order in which they were presented.

The first practical question, as expressed by the counsel, in the course of his argument, is, whether the arrest of the prisoner in this proceeding was a legal arrest. The facts out of which that question arises appear, by the return to the certiorari, to be these: A mandate had been issued by the president, directing proceedings against the prisoner, in compliance with a requisition by the government of Great Britain, and a complaint had been made before the same commissioner, at an earlier day, in which the charge of forgery by the prisoner was made, that charge being only particularized by the statement that he had been guilty of forgery, in the making of two certain bills of exchange for one thousand pounds each, with intent to defraud the governor and company of the Bank of England. Upon that complaint a warrant had been issued for the arrest of the prisoner, he had been arrested, and inquiry into the question of his criminality in the matter thus charged had begun. The question whether, in the proceedings had upon that complaint, the commissioner, and the marshal who executed his warrant, acted legally, had been brought under judicial inquiry, and the proceedings and warrant had been pronounced by one of the judges of this court, after full argument, legal.

Still entertaining the views which governed that decision, we are bound now to pronounce that arrest and that detention legal—legal then, and legal always. So that, on the 24th of April, before the discontinuance of the proceedings under that arrest, (or, to use the other form of expression, before the discharge of the prisoner from that arrest,) he was held in legal custody. While he was in that custody, the warrant of arrest now in question was placed in the hands of the marshal; and thereafter, on the following morning, on the suggestion of the prosecuting counsel that they had no further evidence to offer in support of that prior charge, (and, plainly, upon the face of the proceedings, because the evidence produced did not establish that charge sufficiently to warrant any other result,) the commissioner discharged the prisoner from that arrest. It is now argued, that, by some legal retroaction, the

discharge of the prisoner from that arrest establishes, and establishes conclusively, that he was, up to that time, held under illegal arrest. That reasoning we cannot affirm. All that that decision affirmed was, that the demanding government, or those who represented the demanding government, in that prosecution, had failed to establish the charge; but, down to the time of that decision, the detention of the prisoner was legal, as had already been pronounced, and as we still affirm. To hold now, that the discharge of the prisoner from arrest under that charge, for want of sufficient evidence to justify his commitment, operated retroactively, to make the precedent holding and arrest illegal, is to hold, if it be extended, as the principle of the argument must extend it, to other and kindred cases, that, whenever a party once charged with crime has been arrested and subsequently discharged, whether for informality, for want of proof, on verdict, or on other legal grounds. ipso facto, all who were actors in the previous arrest were trespassers, and liable to be proceeded against as such, as if the arrest and all prior proceedings were void ab initio. No such result is due to the fact that the prisoner, having been arrested, is discharged from custody. Such a doctrine, we think, would be fruitful of mischief that could not be tolerated. It, therefore, is not true that the arrest on the present warrant was illegal, because the prisoner was, at the time it was issued to the marshal, illegally detained; and, if so, that branch of the argument fails, and must be overruled.

It is, however, suggested, that, the prisoner being in custody under a warrant of arrest, if the view we have. just discussed, be not taken, then he was in legal custody; that it was irregular to issue another warrant of arrest, and place it in the hands of the marshal; and that, if proceedings against him, with a view to another or subsequent charge were to be instituted, it ought to have been done by. a detainer lodged with the jailer. and not by a warrant of arrest delivered to the marshal. Without entering into the discussion of a mere question of practice, it is enough to say, that we are of opinion that such a technical objection has no place in proceedings for the execution of this treaty, and has no application to this subject. The prisoner had not then been committed to any jail. He was kept in the custody of the marshal, who used such place of safe keeping as was available to him, and the new warrant of arrest must necessarily be delivered to the marshal. Such new warrant operated to make it the duty of the marshal to detain the prisoner to await proceedings under it.

It was insisted, that the decision of this court in a former case involved, as a necessary result, a proposition which. if maintained, rendered the arrest under the present warrant illegal. In the case of In re Farez [Case No. 4,644], before this court, on habeas corpus, the opinion was expressed by the judge, that, while in the custody of the court, by virtue of a writ of habeas corpus, a prisoner was to be protected against arrest upon a new warrant, and, obviously, because it was a direct interference with the power of the court then engaged in inquiring whether there was ground for detaining the prisoner under the subsisting arrest; and that the court owed it to itself, and to its necessary power to exercise its own jurisdiction, to see to it that no prisoner in its custody, held on habeas corpus, was withdrawn from it pending the proceeding. Such a case has no application to the present point. The prisoner was not in the custody of any court. He was held by a ministerial officer, with a view to an inquiry into a charge of crime, and there was nothing inconsistent with the course of that inquiry, that another warrant of arrest, issued by the same commissioner, directing that he be brought before him, should be placed in the hands of the marshal, to the end that an inquiry might be had upon a fresh charge. It was not held, in the Case of Farez, that a new warrant of arrest was invalid, because issued pending the proceedings on habeas corpus, but only, that, while the prisoner was in the custody of the court, it could not be executed, so as to withdraw him from that custody. So, here, the present warrant of arrest was not invalid because issued while the prisoner was held under a prior warrant. In the most favorable view that can be taken, it operated, when he was discharged from the prior warrant, to require the marshal to detain him in custody. No power of any court was invaded. There was no conflict with any requirement or duty of any court to see to it that its jurisdiction was not interfered with. That case, as we think, has no application to the subject before us; and we, therefore, hold, that there was nothing in the circumstances relied upon, which invalidates the arrest and detention under the second warrant.

The discussion of the point last considered was deemed, by the counsel for the prisoner, to involve the question whether, in truth, this second arrest was or was not for the same charge. The counsel hereupon insists, that, upon the same charge for which the prisoner was first arrested, he was not liable to a second arrest, not only for the reasons above referred to, but because the discharge from the first arrest operated as an acquittal, and that, therefore. if we do not sustain the grounds for discharge already considered, the prisoner must, nevertheless, be discharged, unless the second arrest was based upon a charge of a distinct offence. That the second arrest was for the same offence as the first, is claimed by the prisoner's counsel, upon, in substance, this reasoning: Inasmuch as the treaty of extradition (8 Stat. 576, art. 10) provides. that. upon the requisition of the demanding government, setting forth that

the alleged fugitive is charged with the offence of forgery, he shall, in the manner pointed out in the treaty, be surrendered to the demanding government, for trial, therefore, if forgery be charged, it, ex vi termini, means all forgeries up to that time committed; and, therefore, although it may be true, that a second application or requisition for surrender proceeds upon an allegation of the forgery of distinct and separate instruments, there is therein, nevertheless, but the charge of forgery, and it is, therefore, the same offence, because forgery was charged in the first requisition. The fallacy of that view of the subject is quite apparent, when it is suggested, that every forgery is an offence; that, as there may be several forgeries, so there may be, and so there are, several offences; and that there may be as many indictments, as many trials, as many convictions, and, we add, as we think is the necessary consequence, as many demands of surrender, and as many proceedings preliminary to surrender, as there are instruments forged, or, in other words, in the view that we take of the subject, as there are offences. It is unnecessary to add, that there need not be so many warrants of surrender, for the obvious reason, that, when the prisoner has been once surrendered, a further warrant of surrender would be useless, and, therefore, the executive need not be called upon to make more than one, unless, perhaps, for some cause, the first warrant of surrender had not been executed. In that case, a second warrant of surrender might be issued.

The requisition, mandate and complaint under which the second warrant of arrest was issued, and under which the proceedings now in question were taken, charge the prisoner with forging and uttering eleven different bills of exchange, each specifically described. The first proceeding related to two bills of exchange, described in such general terms that, while they may answer the description of two of those named in the second proceeding, they are not clearly identical therewith, and the other nine are plainly distinct and separate forgeries. It is, however, insisted, that the discharge from arrest under the first warrant was such an acquittal as precluded another arrest under the second warrant. The reasons which we have given for our view of the other points, in the order in which they were presented by the counsel, lead necessarily to the answer which we give, decidedly, that it has no such legal effect. Not only so; we purposely refrain from even affirming, or admitting, that, if the offence charged had been identical in both complaints, the prior discharge would have operated as a necessary legal bar to a subsequent arrest, commitment and surrender, when the demanding government was able to produce proper evidence to sustain it. Be that as it may, we do hold, that such discharge has no legal operation or effect upon proceedings for the surrender of a fugitive,

based upon complaint of a distinct offence. The executive may be called upon to guard against abuse, or against oppressive proceedings. The executive may, perhaps, be justified in saying to the demanding government: "You have had your day. You have had your opportunity. We have, in good faith, given you the benefit of the instrumentalities pointed out in the treaty, in order to effect the surrender of the alleged fugitive whom you demand; but we will see to it that needless or vexatious prosecutions be not indulged in." On the other hand, we unhesitatingly say, that, if the government be satisfied that a failure to procure a surrender in the first instance was due to circumstances explainable, consistently with good faith, and consistently with proper respect to our government, and the case be such as properly appeals to the sense of justice which this government always entertains, a further mandate may be issued on a second requisition, and the proceedings that will follow, conducted by the judicial officers of the government, will be legal. Indeed, on that subject, we apprehend, that the magistrate before whom the prisoner is brought has no right to entertain the question. And, in reference to this point, we add, that there is no necessary legal obligation, on the part of the demanding government, to place in its original requisition all the offences of which it may suppose that the fugitive has been guilty. What may, in fairness and candor, be due between the two governments, and whether the president would grant further and successive mandates, where the proceedings were rendered unnecessarily vexatious, by withholding the information which the demanding government possesses, and so instituting several successive prosecutions, when one is sufficient, is, we think, a question for the executive, and not for the court or the commissioner.

The next point in the order of the discussion was, that, if the proceedings before the commissioner thus far be held to be legal, the prisoner should, nevertheless, be discharged from custody, because the commissioner, in the conduct of the inquiry into the criminality of the fugitive, received incompetent evidence. The supposed illegal evidence consists of depositions of two classes. The first class embraces depositions which are certified to have been taken before the lord mayor of London, before a warrant of arrest, which forms a part of the documents produced on the hearing before the commissioner, was there issued. The other class consists of depositions which were taken successively on two supplemental informations and inquiries, at dates subsequent to the issuing of that warrant of arrest.

In respect to the first class, it seems to us sufficient to refer to the language of the acts of congress under which these proceedings have been conducted, and to state that the necessary construction of those acts involves

the correctness of the commissioner's ruling in this respect. We think we might place the decision of that point upon the act of August 12, 1848, alone (9 Stat. 302); but, under that act, as supplemented by the act of June 22, 1860 (12 Stat. 84), it seems to us that there can be no reasonable doubt. Section 2 of the act of 1848 provides, that, "in every case of complaint as aforesaid," (referring to proceedings under a treaty for the extradition of criminals,) "and of a hearing upon the return of the warrant of arrest," (issued by the magistrate), "copies of the depositions upon which an original warrant in any such foreign country may have been granted, certified under the hand of the person or persons issuing such warrant, and attested, upon the oath of the party producing them, to be true copies of the original depositions, may be received in evidence of the criminality of the person so apprehended." It will be seen, that the principle upon which this act proceeds is, that evidence which, in the foreign country, was held sufficient to authorize the arrest of the fugitive, ought to be received as evidence here upon the same charge. But, to identify that evidence and show that the documents produced do contain the evidence received in such foreign country, they must be authenticated as true copies. The authentication which this statute contemplates is a certificate under the hand of the person or persons issuing such warrant, and attestation, upon oath, that they are true copies of the original depositions. That these depositions are certified under the hand of the person issuing the warrant in the case now before us, to wit, the lord mayor of London, is not questioned.

Congress, in 1860, evidently conceiving that exigencies might arise, doubtless knowing that exigencies had arisen, in which there was difficulty in furnishing seasonable oral proof by the oath of the party producing the depositions, provided, in the act of 1860, that such depositions, or copies thereof, if they shall be properly and legally authenticated, so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, shall be received in evidence. Here, again, congress recognizes the propriety of receiving in evidence here depositions which are so authenticated as to entitle them to be received for similar purposes by the tribunals of the foreign country. Such depositions are, in their nature and by express terms, made admissible here. Had the act stopped there, the question arising on the offer of such depositions would not be—are such depositions admissible, but, are they so authenticated that they are entitled to be read in the foreign country for similar purposes? How are the tribunals of this country to be advised of the sufficiency of the authentication? That question might have created embarrassment had the act of congress gone no further.

Should oral proof be taken? What official certificates from the foreign tribunals, or government, or officers, would establish it? To relieve all doubt or embarrassment, the act declares what may be taken as proof, and conclusive proof, of such authentication, which the court must recognize, and by which that fact is established, in these words: "The certificate of the principal diplomatic or consular officer of the United States, resident in such foreign country, shall be proof that any paper or other document so offered is authenticated in the manner required by this act." It seems to us, that that removes all doubt from this question. Such certificate is not merely evidence, it is proof of such due authentication. The certificate of our minister at the court of St. James was produced before the commissioner. That certificate is unqualified, in its certification, that the depositions are authenticated in the manner required by the act, to wit, so authenticated as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party is alleged to have escaped. It seems to us that that certificate is, in its nature, a judicial act, which neither the commissioner nor this court can disregard or overrule. Moreover, that certificate states, on its face, that it is given and made under and pursuant to the provisions of the act of 1860. It may, therefore, be regarded, by its reference thereto, as incorporating the act itself, so far as the details of its requirements are involved in the certificate. It follows, that, in regard to the first class of depositions, there is no room to hesitate, in affirming the correctness of the ruling of the commissioner in receiving them as evidence.

It is suggested that this construction of the acts of congress involves an interference with the rights of the prisoner, as creating a species of evidence which the treaty did not contemplate. 8 Stat. 576, art. 10. We are aware, that, by the terms of the treaty, the proof which the government of the United States is bound, and which alone it is bound, to respect, as creating an obligation on its part to surrender a fugitive, is such evidence of criminality as, according to the laws of the place where the fugitive or person charged is found, would justify his apprehension and commitment for trial, if the offence had been there committed. In the first place, this language has especial reference to the degree, quantum, or weight of the evidence, rather than to the instruments of evidence themselves; and an act of congress prescribing what instruments or vehicles of evidence shall be received, and how they may be authenticated, is in no inconsistency with the treaty. But, more than this—it was just as competent, as a question of power, for the government of the United States, by act of congress, as it was competent in the treaty itself, to say upon what evidence of criminality it would perform the stipulations

in the treaty; and, therefore, when congress declared, by their act, for the guidance of judicial officers, what shall be admissible to establish criminality, in the inquiry which, by the terms of the treaty, the government is bound to institute, they made their enactment the law of the place where the prisoner is found, for all the purposes of the proceedings under the treaty. Therefore, it is true—technically and literally true—that the evidence by which the prisoner in the present case has been charged, so far as it conforms to the provisions of the act of congress, was evidence competent, in its nature, to justify any conclusion which is properly deducible therefrom, in the place where the prisoner was found, and where he was apprehended.

As to the supplemental depositions, taken after the warrant was issued, their admissibility depends entirely upon the construction of the act of 1860. There are two grounds upon which we may hold that their admission does not invalidate the proceedings had before the commissioner in this case. If the construction which we have intimated of the act of 1860, namely, that the certificate of the principal diplomatic or consular officer of the United States, resident in the foreign country, is proof, plenary and conclusive, that the documents offered in evidence are so authenticated that they are entitled to be received for similar purposes by the tribunals of England, be correct, then, by the terms of the act of 1860, it was the duty of the commissioner to receive them in evidence; and they were competent, because so pronounced by the diplomatic officer to whom that question is referred by the act of congress itself. If it were profitable, we might occupy time in suggesting reasons for the enactment, showing its propriety and its convenience; and we might even go further, (if it were proper for the court to attempt to justify an act of the supreme legislature,) in support of the construction of the act of 1860, above stated. But we do not think that is necessary; and for the further reason, that, without resting the disposition of this case, in any respect, upon the conclusive effect of the certificate of the American minister, we are of opinion, that, even though the second class of depositions were inadmissible, their reception furnishes no ground for the discharge of the prisoner.

The arguments urged upon our attention proceed very much upon an assumption, which is entirely erroneous, to wit, that, in this proceeding, under the writ of habeas corpus, we are sitting as an appellate tribunal. That is not our relation to the commissioner. A judge issuing a writ of habeas corpus, or a court issuing a writ of habeas corpus, in these cases, is exercising an independent and original jurisdiction, with a right to inquire, doubtless, whether the prisoner is legally held. What shall be the scope and extent of that inquiry, has been very

much controverted in the courts of this circuit. We say, on that subject, first, that we are not sitting as an appellate tribunal, for the purpose of reviewing the proceedings before the commissioner, as upon allegation of error. This is not a writ of error. The inquiry here is not to be conducted upon the rigid, technical rules applicable to a writ of error, which is in the same proceeding. Sometimes, it is true, a writ of error is called a new suit, but, in its relation to the subject-matter, and in its ultimate result, it is so connected therewith, that it may be properly called a continuation of the same proceeding. It may result in reversing. What then? If the case is one which calls for it, a venire de novo may be had, which reaches back to the point where the error occurred which requires the proceedings to be reversed. If the decision is one of affirmance, it then adds an additional record sanction to what the inferior tribunal has done. This proceeding has no such relation to the proceedings of the . commissioner. The question to be determined upon habeas corpus, in these cases, is, as we apprehend—is the prisoner rightly held, or is he to be discharged? If the commissioner, having acquired jurisdiction of the subject-matter, and of the prisoner, commits an error in the reception of evidence, it does not follow, by any legal rule, that his proceedings are to be held for naught, and void for error. The prisoner may, nevertheless, be legally held.

Our conclusion in regard to the case, as it stands upon the evidence, calls upon us to say, that, whether the supplementary depositions were or were not admissible, the prisoner is legally held. Without those depositions the proofs justify the conclusion of the commissioner, and his commitment of the prisoner for surrender.

This brings us to notice the questions of fact, in relation to which what we have to say will be very brief. It is claimed, that, even with the evidence that we have last adverted to, a case was not made out justifying the commitment of the prisoner. Before, however, discussing that point, we desire to call attention to the state of the adjudications in this circuit. Three views have been taken of the power and duty of the court, on habeas corpus and certiorari, to entertain the question of the sufficiency of the evidence to warrant the commitment for surrender.

It was held, and held successively for many years (In re Veremaitre [Case No. 16,915]; In re Kaine [Id. 7,598]; In re Heilbronn [Id. 6,323]; Ex parte Van Aernam [Id. 16,824]), that, if it appeared to the judge or to the court issuing the writs, that the commissioner had acquired jurisdiction, by a conformity of the proceeding to the requirements of the treaty and the acts of congress, and that he had not exceeded his jurisdiction, that was an end to inquiry; that, whether the evidence received by him was sufficient or insufficient, was a question to be determined

by him; that no tribunal had been provided by the treaty, and no jurisdiction had been given by any act of congress, to any judge, magistrate, or court, to review that decision; that the only review possible was a review by the executive, to whom the proceedings had before the commissioner were to be returned; that the executive had power to examine for himself, and determine whether a case had been made within the treaty, and whether a case had been made which called upon him, as executive of the government of the United States, to surrender the fugitive; and that, as this special jurisdiction in a special proceeding not theretofore within the jurisdiction, original or appellate, of any court or magistrate of the United States, had been conferred by law upon the magistrate acting under the act of congress, and as it was made his duty to certify his conclusions as the basis of executive action, without giving any right of appeal, in any form, to any other magistrate or to any court, there was no appeal and no supervisory authority to be exercised, except by the executive.

The next stage in the history contained an opinion which is supposed to go one step further. We may say, without disrespect to the decision itself, in any wise, that the decision in which the opinion was pronounced (In re Kaine [Id. 7,597]), had other grounds upon which it was deemed to be called for. The decision was, that the commissioner never acquired jurisdiction; but the opinion, nevertheless, went further, and held, that, in the case under consideration, there was no competent evidence before the commissioner, that is to say, there was no legal evidence upon which the commissioner could act, for, if the evidence was not competent, it was not legal; that, if there was no competent evidence before the commissioner, the proceedings before the commissioner were to be treated, whenever presented to any other tribunal, as an arbitrary act of commitment, upon mere complaint; and that the question became, therefore, a question of law, not a question of fact, before the court, on habeas corpus, whether a commissioner could, upon complaint, issue a warrant of arrest, and, upon the appearance of the prisoner before him, commit him for surrender. With that view of the subject, and with the assertion of the right to inquire, upon habeas corpus, whether the proceedings of the commissioner had been, in that sense, legal, or, in other words, whether he had not departed from his jurisdiction, which was a jurisdiction to inquire into and ascertain facts, and not to declare facts without any evidence before him, we are not disposed, at present, to raise any controversy.

The next step in the consideration of this subject elicited the opinion (In re Henrich [Id. 6,369]), that the court, acting in the proceedings instituted by habeas corpus and certiorari, was not confined to the mere inquiry whether there was any evidence; but

that, if it could see that there was a substantial defect of evidence, it might and ought, not necessarily to discharge the prisoner, but to hold that the warrant of commitment was illegally granted.

That view of the subject was followed, in its next step, or perhaps, in its consequence, by the holding (In re Farez [Cases Nos. 4,645, 4,646]) that it was not the duty of the court to discharge when an error in rejecting evidence for the prisoner had been committed, but to remand, that the error might be corrected, and the proofs be continued, if it was so desired, to the end that the facts might be ascertained, and that, if the prosecuting government were able, it might yet establish a case against the prisoner. Indeed, in the previous case to which we have referred, to wit, where the judge was of opinion that there was no legal evidence (In re Kaine [supra]), he offered, upon announcing the conclusion that he had reached, to detain the prisoner, to the end that the inquiry might proceed, the defects be supplied, and proper and competent evidence be produced before him.

In no view of the subject, therefore, should we be called upon to discharge the prisoner, upon the idea that the evidence was not sufficient. No case has yet gone so far as to say, that, because some evidence was introduced which was not legal or competent, or because the court, upon a review of the evidence, was of opinion that it would have come to a different conclusion upon the evidence, therefore, the proceedings were illegal and the prisoner should be discharged. The inconveniences and the evils of such a rule, applicable to this subject, are so great, that the assertion and maintenance of that view of the meaning of the treaty might be assailed as evidence of bad faith. It has been deemed settled by the law of England, and the doctrine has been reiterated in this country, that a determination of one judge, or a determination of one court, touching a question of discharge under habeas corpus, is not a bar to the issuing of another writ by another court, or by another magistrate, and that, practically, a person held in detention may have successive writs of habeas corpus, so long and so often as he may find a judge or a court to whom he may address his petition. That practice, applied to this subject, works this result. If the judge or the court, in these cases where extradition is sought, is at liberty, on habeas corpus, to weigh the evidence before the commissioner, and inquire whether they would have reached the same conclusion, the result is, that the finding of the commissioner, and the findings of successive courts and judges issuing successive writs of habeas corpus, so long as judges can be found, instead of having any force or effect, can be assailed, and assailed again, until, at last, perhaps, some doubting mind may be found, who will say, "I would have reached a different conclusion upon the evidence," and thereupon discharge the pris-

oner. To that view of the duty of the court, touching the weight of evidence before the commissioner, we cannot subscribe. We are not called upon, by any decision heretofore made, to assert any such rule. We feel conscious, not merely of the inconvenience, but, as we apprehend, of the great injustice, that would result from any such construction of the treaty and the acts of congress. Even in the case most relied upon (the Henrich Case [supra]), notwithstanding what is stated in the previous portion of the opinion, the conclusion of the court leaves this question open to consideration, and, as we think, in the form and manner in which we have stated our views; for, although the power is there asserted to reverse or overrule a proceeding before a commissioner, for the want of sufficient evidence, still it is stated that it is not to be done upon slight grounds.

Assuming, nevertheless, for the purposes of this case, that inquiry into the evidence is open to us, in these proceedings, we are brought finally to the question whether, upon the evidence, a case is made out which would justify the commitment of the prisoner for trial. We have carefully examined the evidence in its details, enlightened by the views urged upon us by the counsel for the prisoner, and we are constrained to conclude, that the commissioner, (even without the testimony in respect to which exception was taken,) would have been derelict in his duty if he had not made the commitment for surrender which he was called upon by the prosecuting parties to make. This is not a trial of the prisoner. Much that was urged upon us, much that was urged touching the admissibility of evidence, much that was urged with regard to the sufficiency of the testimony, proceeded upon the principles which govern a court and a jury when the question of guilt or innocence is finally to be determined. A fugitive is not to be surrendered upon slight grounds. There should be reasonable evidence, reasonable cause to believe, and, in conformity with the case last referred to, we might go further, perhaps, and say, that there should be such prima facie case made by proof, as, being submitted to the jury, and being found by them to sustain the charge, would make it the duty of a court to sustain the verdict. Such testimony, we think, is found in this case. We are, therefore, not called upon to say anything more touching the power or the duty of the court to examine and weigh the evidence. If such be our duty, we find it sufficient. If, there being some evidence tending to establish the prisoner's criminality, we are not to review the finding of the commissioner upon the weight of the evidence, the result in this case is the same.

The objection has been urged, by the counsel for the prisoner, that it is not sufficiently proved that the lord mayor of London had jurisdiction to issue a warrant of arrest, or to take the depositions in the first instance.

(Opinion of four judges of the supreme court, in Ex parte Kaine, 14 How. [55 U. S.] 115.) If what we have said in regard to the provisions of the act of 1860, touching the certificate of our minister plenipotentiary, be adopted as the rule of decision, that disposes of this question; for, in that case, his certificate that the depositions which are offered are so authenticated as to entitle them to be read in the courts of that country, is the conclusive test of the admissibility of the evidence before the commissioner here. But, we are of opinion that the jurisdiction of the lord mayor is sufficiently established. It is not necessary that we should refer to the statute of Edward III., which defined and conferred the powers of justices of the peace in England, or inquire to what extent the tribunals of this country are at liberty, or are bound, to take judicial notice of the existence of such officers, from that period down to the time of our Revolution, or to recognize the existence of their jurisdiction and authority, and to dispense with proof that such officers have jurisdiction to keep the peace, and, as magistrates, to arrest, on charge of crime, and hold to bail, and detain for trial. Much might be said, it seems to us, in support of that view of the subject, and to sustain the jurisdiction of the lord mayor, who appears, by these proceedings, to be a justice of the peace, without any other proof whatever. But, we think, that, if evidence is necessary, evidence was produced competent to prove it. We have, in the testimony, the affirmative fact that he is the chief criminal magistrate of the city of London. That is testified under oath. There was no cross-examination, there was no inquiry into the sources of the witness' knowledge, and nothing offered in impeachment of the verity of what was testified. The certificate of the government of Great Britain, in any form, would have told no other tale. At least, it establishes that he is, in fact, in the exercise of the power and authority of the chief criminal magistrate of the city of London. It might be plausibly suggested, were it not for some things that have been said in former cases, that, when the act of congress of 1848 provided that the depositions on which a warrant had been granted in the foreign country, certified by the person issuing such a warrant, might, when proved to be true copies, be received in evidence, there was no room for inquiry here into the jurisdiction of that person. We do not, however, propose to go so far. We do say, that the proof adduced before the commissioner, in connection with the certificate of the lord mayor, and the authentication or certification, ample and full as it is, by our minister, completes the chain of evidence, and sufficiently establishes the jurisdiction of that officer.

To conclude, we find nothing that will justify our further interference with the custody of the prisoner, under the warrant of

commitment by which he is held, subject to the warrant of the executive for his surrender. The prisoner is remanded to the custody from which he was taken, and the writs are discharged.

NOTE. On the 23d of May, 1873, writs of habeas corpus and certiorari, on the relation of Macdonnell, were issued by Mr. Justice Fancher, of the supreme court of New York, directed to the United States marshal and to Commissioner Gutman, returnable at the court of oyer and terminer, June 4th, 1873. On that day, the marshal did not produce the body of the relator, but, through his counsel, made return, that he held the relator under a warrant issued by Commissioner Gutman, pending proceedings for his extradition, on the application of the British government, charged with the crimes of forgery and the utterance of forged paper; that such proceedings had been made the subject of review by the United States circuit court, on writs of habeas corpus and certiorari; and that, after such review, the relator had been remanded by the federal court to the custody of the marshal, to await the issuing of the warrant of the executive for his surrender to the British government. After hearing Charles W. Brooke on behalf of the relator, and James C. Carter on behalf of the marshal, Mr. Justice Davis delivered the decision of the court, orally, as follows: "The application now made is in the nature of a motion to regard the marshal as in contempt for not making the proper return to the writ by producing the prisoner. Although counsel do not put it in that form, it amounts substantially to that; and the question is, whether, upon the proceedings and the return now before the court, it is the duty of the court to issue an attachment, under the statute, to compel the marshal to produce the body of the prisoner. There is no doubt whatever of the power of the state courts, in all cases where persons are deprived of their liberty within their territorial jurisdiction, to issue the writ of habeas corpus, for the purpose of inquiring into the cause of the detention; and that power is applicable to all cases where it does not appear upon the face of the petition for the writ, that the case is one either extra-territorial, or exclusively within the jurisdiction of some other tribunal. I assume that the petition in this case did not show to Mr. Justice Fancher, who issued this writ, any fact clearly establishing that this prisoner was held by a jurisdiction which precluded the state court from investigating the cause of detention. It, therefore, became the duty of the judge to issue the writ, and it became the duty of the marshal so far to obey it as to make known to the court, in proper form, over his official signature, the cause of the detention of the prisoner by himself.