## *Ex parte* PERKINS.[1]

### (*Circuit Court, D. Indiana.* March, 1887.)

1. CONSTITUTIONAL LAW—AUTHORITY OF CONGRESS TO REGULATE ELECTIONS.

    The mere fact that a representative in congress is voted for at an election of state and county officers does not authorize congress to regulate such election in matters which in nowise relate to or affect the result so far as concerns the United States.

2. ELECTIONS—UNITED STATES STATUTE REGULATING—REV. ST. U. S. §§ 5511-5515—ALTERATION OF VOTE FOR STATE OFFICER.

    Rev. St. U. S. §§ 5511-5515, making it an offense against the United States, among other things, for any officer, state or national, of an election at which a representative or delegate to congress is voted for, to violate any duty in regard to such election imposed on him by state or federal law, does not embrace any act which has exclusive reference to the election of state or county officers, and the alteration, by officers of such an election, of the statement upon the tally-sheets of the vote for certain local officers, in pursuance of a conspiracy, is not an offense against the United States.

3. UNITED STATES COMMISSIONER—JURISDICTION.

    A United States commissioner has no jurisdiction to examine a person arrested and brought before him upon an affidavit alleging facts which are claimed to constitute an offense against the United States, but which in fact do not; it being admitted that there are no other facts in the case than those contained in the affidavit.

4. SAME—POWER TO PUNISH FOR CONTEMPT—REV. ST. U. S. § 1014.

    The provision of Rev. St. U. S. § 1014, that offenders against the United States may be arrested, imprisoned, or bailed by certain officers named, including United States commissioners, "agreeably to the usual mode of process against offenders" in the particular state. does not confer upon commissioners the power to punish for contempt possessed by state officers, and they have no power to punish for contempt.

5. HABEAS CORPUS—CONTEMPT.

    If a court, in a case in which it has no jurisdiction over the parties or subject-matter, sentences a person for contempt, such person may be released by any court having authority to issue writs of *habeas corpus.*

Appeal from District Court. Upon *habeas corpus.*

Petitioner was committed by a United States commissioner for contempt in refusing to be sworn as a witness, in an examination, before the commissioner, of certain persons charged with violation of the United States election laws. The affidavit upon which the examination was based was as follows:

"Before me, William A. Van Buren, a United States commissioner, appointed by the circuit court of the United States for the district of Indiana,

[1] Reversing decision of district court, appended hereto.

in the Seventh circuit, to take acknowledgments of bail, etc., according to the acts of congress in that behalf provided, personally appeared this day Theodore A. Wagner, who, being first duly sworn, deposes and says that he has good reason to believe, and does verily believe, that on the second day of November, in the year of our Lord, 1886, at the district aforesaid, an election being then and there holden for the choosing of a representative in the congress of the United States from the Seventh congressional district of the state of Indiana, said election being holden on the same day and year last aforesaid, certain persons, to-wit, William F. A. Bernhamer, Simeon Coy, Henry D. Spaan, and John Counselman, and others to this affiant unknown, did conspire together, and with each other, to commit an offense against the United States; that is to say, the said persons, to-wit, William F. A. Bernhamer and John Counselman, being then and there officers of said election aforesaid, and members of the board to canvass the returns thereof, that is to say, being then and there inspectors, and said William F. A. Bernhamer, being the duly-elected chairman of said canvassing board, respectively, and the said Simeon Coy and Henry D. Spaan, being citizens and voters present at said election and said canvass of the returns thereof, at said election duly appointed and sworn to discharge his and their duties as such officer and officers, at said election for the Second precinct of the Fourth ward of the city of Indianapolis, in the county of Marion, in the state of Indiana, and district aforesaid, did then and there unlawfully, fraudulently, knowingly, and feloniously do a certain act in pursuance of said conspiracy, to effect the object thereof, which object was then and there to falsely, unlawfully, and feloniously change the tallies, tally-sheets, and the returns thereon, of and at said election, at the precincts hereinafter named, so as to show, by false, fraudulent, forged, and substituted returns of said tallies and upon said tally-sheets, that one Frank A. Morrison was then and there chosen and elected at said election to the office of coroner of the said county of Marion, whereas in truth and in fact he was not so chosen and elected; and also to show, by said false, fraudulent, forged, and substituted returns, that one Albert F. Ayres was then and there chosen and elected to the office of judge of the criminal court of said county of Marion, whereas in truth and in fact the said Ayres was not so chosen and elected; and otherwise to change, alter, and forge said tally-sheets and said returns thereon at said election aforesaid."

Here follows a detailed statement of the erasures and alterations made in a number of tally-papers and poll-books, but all in reference to the offices of criminal judge and coroner.

*David Turpie*, Dist. Atty., *Ritter & Ritter* and *Harrison, Miller & Elam*, for the United States.

*Baker, Hord & Hendricks, Harris & Calkins*, and *Duncan, Smith & Wilson*, for petitioner.

GRESHAM, J. The statutes of Indiana provide that when the votes at any election are counted, the board of judges shall make out a certificate stating in words the number each person has received for any office; and such certificate, with one of the lists of voters and one of the tally-papers, shall be deposited with the inspector, or one of the judges selected by the board. Section 4712. Before this certificate is made out, the ballots, with one of the lists of voters and one of the tally-papers, are, in presence of the judges and clerks, placed by the inspector in a paper envelope or bag, which is closed, sealed, and delivered by him to the county clerk as soon as possible, on or before the Thursday next

succeeding the election. Section 4713. The inspectors of each township or precinct, or the judges to whom the certificates, poll-books, and tally-papers are delivered, constitute a board of canvassers, whose duty it is to canvass and estimate them, and to assemble at the court-house, on the Thursday next succeeding the election, for that purpose. Section 4715. The board of canvassers is required to compare and examine the papers intrusted to it, and to aggregate and tabulate from them the vote of the county. A statement thereof is drawn up by the clerk of the circuit court showing the votes for each person in each township and precinct, and the aggregate of such votes, which is signed by each member of the board, and delivered to the clerk, with the certificates, poll-books, and tally-papers so used by it. Section 4717. The board declares and certifies the highest number of votes given for each office, (section 4718,) and 10 days after its return is made the clerk issues certificates of election to persons entitled thereto, on their demand, except where they are commissioned by the governor. In such cases, the clerk, within 10 days after the receipt by him of the return of the board, forwards a statement of the votes and the persons who have been declared elected, by mail, to the secretary of state. Section 4721. The secretary of state immediately compares and estimates the votes given for representatives in congress, and certifies to the governor the persons having the highest number of votes as duly elected, and the governor issues to each of them a certificate of his election. Section 4728.

On the seventh day of December, an affidavit was made and filed by Theodore Wagner before William A. Van Buren, one of the commissioners of this court, charging William F. A. Bernhamer and John H. Counselman, who were officers of an election which was held on November 2, 1886, for the purpose of choosing state and county officers and a representative in congress from the Seventh congressional district of Indiana, with having conspired with Simeon Coy and Henry D. Spaan to commit an offense against the United States by changing the tally-papers that were prepared at several precincts, and designed for the use of the board of canvassers, so as to show and have it declared that Frank A. Morrison was elected coroner, and Albert F. Ayers was elected criminal judge, of Marion county, when they were not so elected; and that, in furtherance of this conspiracy, they did so change such tally-papers. The defendants were arrested, and brought before the commissioner for examination, and in the course thereof Samuel E. Perkins was subpœnaed, and called as a witness for the government, and declined to be sworn or testify, claiming that the commissioner had no jurisdiction of the offense charged in the affidavit. He was thereupon committed to the jail of Marion county for the term of three months by the commissioner as for a contempt of court. Perkins applied for release upon a writ of *habeas corpus*, which was denied by the district court, and his application is now before this court on appeal.

The provisions of the federal statutes which are cited as applicable to the offenses charged in the affidavit are sections 5511, 5512, 5514, and 5515. So much of section 5511 as need be referred to provides that if

at any election for representative in congress, any person knowingly personates and votes, or attempts to vote, in the name of another, or votes more than once at the same election, for any candidate for the same office, or by threat, intimidation, bribery, reward, or offer thereof, unlawfully interferes in any manner with any officer of such election in the discharge of his duties, or by any such means, or any other unlawful means, induces any officer of an election, or officer whose duty it is to ascertain, announce, or declare the result of any such election, or give or make any certificate or evidence in relation thereto, to violate or refuse to comply with his duty, or knowingly aids, counsels, or advises any such voter or officer to do any act thereby made a crime, or omits to do any duty the omission of which is thereby made a crime, shall be punished as therein specified.

The greater portion of section 5512 relates to fraud in registration of voters at elections for representatives in congress, and concludes by declaring that if any such officer or other person who has any duty to perform in relation to such registration or election, in ascertaining, announcing, or declaring the result thereof, or in giving or making any certificate, or evidence in relation thereto, knowingly neglects or refuses to perform any duty required by law, or violates any duty imposed by law, or does any act unauthorized by law, relating to or affecting such registration or election, or the result thereof, or any certificate or evidence in relation thereto, or if any person aids, counsels, procures, or advises any such voter, person, or officer to do any act hereby made a crime, every such person shall be punishable as in the last section.

Section 5514 declares that whenever the laws of any state or territory require that the name of a candidate or person to be voted for as representative or delegate in congress shall be printed, written, or contained on any ticket or ballot with the names of other candidates or persons to be voted for at the same election, as state, territorial, municipal, or local officers, it shall be deemed *prima facie* evidence to convict any person charged with voting, or offering to vote, unlawfully, under the provisions of this chapter, to prove that the person so charged cast or offered to cast such a ticket or ballot whereon the name of such representative or delegate might by law be printed, written, or contained, or that the person so charged committed any of the offenses denounced in this chapter with reference to such ticket or ballot.

Section 5515, which is chiefly relied upon as authorizing the examination before the commissioner, is as follows:

"Every officer of an election at which any representative or delegate in congress is voted for, whether such officer of election be appointed or created by or under any law or authority of the United States, or by or under any state, territorial, district, or municipal law or authority, who neglects or refuses to perform any duty in regard to such election required of him by any law of the United States, or of any state or territory thereof, or who violates any duty so imposed, or who knowingly does any act thereby unauthorized, or who fraudulently makes any false certificate of the result of such election in regard to such representative or delegate, or who withholds, conceals, or destroys any certificate or record so required by law respecting the election of

such representative or delegate, or who neglects or refuses to make and return such certificates as required by law, or who aids, counsels, procures, or advises any voter, person, or officer to do any act by this or any of the preceding sections made a crime, or to omit to do any duty the omission of which is by this or any of such sections made a crime, or attempts to do so, shall be punished as prescribed in section 5511."

Section 4, art. 1, of the constitution of the United States provides "that the time, place, and manner of holding elections for senators and representatives shall be prescribed in each state by the legislature thereof, but congress may, at any time, by law, make or alter such regulations, except as to the place of choosing senators." The constitution confers upon congress ample power to legislate for the protection and purity of elections for representatives in congress, whether such elections be for representatives alone, or in conjunction with the selection of state and county officers. It is to be steadily borne in mind that the purpose of all such legislation is the securing of an honest result so far as the election of members of congress is concerned. Congress may enact statutes containing specific regulations to accomplish this end, or it may adopt the laws of the states so far as they relate to congressional representatives, and thus and to that extent make the state election officers federal officers, but it can go no further. It does not follow because congress can legislate for the protection and purity of elections for representatives in congress, that it may assume full control of all elections at which such representatives are chosen in conjunction with state and county officers. The mere fact that a representative in congress is voted for at an election of state and county officers, does not authorize congress to regulate such election in matters which in nowise relate to or affect the result so far as it concerns the United States. It has no more right to regulate the election of state and county officers under those circumstances, than it would have if no representative in congress were voted for; and it has not attempted to do so.

The jurisdiction of the federal courts in the enforcement of these statutes depends altogether upon something having been done or omitted which has affected or might affect the result of an election for a representative in congress. The facts stated in the affidavit, in connection with the admissions of counsel in the course of the argument, show that the result of the election was not affected, unless it was by the mutilation of the tally-papers solely and exclusively in the statements of the vote for coroner and criminal judge. It is not pretended that the tally-papers were mutilated, changed, or forged in any other respect, or that any of the tally-papers, poll-books, or ballots were removed from their proper place of custody. The alleged offense against the United States consists wholly in the alteration of the statements of the votes for coroner and criminal judge, as contained in the tally-papers.

It is claimed by counsel for the government that the jurisdiction of the federal courts is complete if anything is done or omitted which amounts to an offense against the state; that it is sufficient to give jurisdiction that a representative in congress was voted for at the election

where it is done or omitted; and that it is not necessary to show that the act done or omitted had any influence whatever on the election of a representative in congress, or the result thereof. It is not claimed that congress has authority to interfere with a state election at which no representative in congress is voted for; and yet it is said the mere fact that such representative is voted for at an election of state and county officers makes all offenses against the state, in connection with such election, offenses against the United States, although the acts constituting the offense have in nowise influenced the result of the election of such representative, and could have no influence on it. If this view be correct, and one personates another in voting for coroner only, at any election where a representative in congress is voted for, his doing so becomes an offense against the United States which is punishable in its courts. Nay, more, if the federal government has jurisdiction in such cases, its jurisdiction is paramount and exclusive, if congress sees fit to assert it; and it may therefore assume the exclusive control of the election of state and county officers where they are held at the same time and in conjunction with the election of a representative in congress, and oust the state courts of their jurisdiction. It was said on the argument that the only way for the states to avoid such a condition of things is to hold its elections at a separate time and place.

It was broadly stated that every act of fraud and corruption in any such election must necessarily have some influence on the election of a representative in congress, although the precise influence which the alteration of this vote for coroner and criminal judge has actually had upon the election of such representative in this case was not indicated. But it was asserted to be the object of the federal legislation to banish all demoralizing influences, actual or potential, from elections where representatives in congress are voted for. This reasoning would apply as well to those elections where separate ballots and ballot-boxes, tally-papers and poll-books are provided for the state and federal offices that are voted for, and to the fraudulent conduct of the officers of elections and voters with reference to either. The effect of such fraud and corruption is too remote to affect the election of a representative in congress within the meaning of the statute.

In discussing and construing the sections now under consideration, the supreme court of the United States in *Ex parte Siebold*, 100 U. S. 371, say:

"In what we have said it must be remembered that we are dealing only with the subject of elections of representatives to congress. If, for its own convenience, a state sees fit to elect state and county officers at the same time, and in conjunction with the election of representatives, congress will not be thereby deprived of the right to make regulations in reference to the latter. We do not mean to say, however, that for any acts of the officers of election, having exclusive reference to the election of state or county officers, they will be amenable to federal jurisdiction; nor do we understand that the enactments of congress now under consideration have any application to such acts."

Under the construction given the statutes by counsel for the government, it is plain that at such an election there could be no "acts of the

officers of election having exclusive reference to the election of state or county officers," and the exemption of them from any amenability to the federal jurisdiction for such acts, in the language just quoted, would have no meaning. If every act in violation of the state laws is equally a violation of the federal laws, it would be impossible to commit any illegal act "having exclusive reference to the election of state and county officers," which is not "amenable to federal jurisdiction." *U. S.* v. *Reese,* 92 U. S. 215; *U. S.* v. *Campbell,* 16 Fed. Rep. 233; *U. S.* v. *Munford,* Id. 223; *U. S.* v. *Wright,* Id. 112; *Brown* v. *Munford,* Id. 175; *U. S.* v. *Cahill,* 9 Fed. Rep. 80; *U. S.* v. *Seaman,* 23 Fed. Rep. 882; *U. S.* v. *Nicholson,* 3 Woods, 215.

An examination of section 5514 shows that the position of counsel for the government is untenable. It provides that whenever under the laws of any state, the name of a candidate for representative in congress might be printed on the same ticket or ballot with the names of state and county officers, "it shall be deemed sufficient *prima facie* evidence to convict any person charged with voting, or offering to vote, unlawfully, under the provisions of this chapter, to prove that the persons so charged cast, or offered to cast, such ticket or ballot," or to prove that "the person so charged committed any of the offenses denounced in this chapter with reference to such ticket or ballot." Now, if the words "so charged," in the last clause, refer back to the offense of illegal voting only, it would have no meaning whatever, and is mere surplusage. In order to give any effect to that clause it must be read as if the word "so" were omitted from it. Being so read, the intention of congress to make the section applicable as a rule of evidence to all offenses becomes more apparent. As thus interpreted, it means that it is only *prima facie* evidence of any offense against the United States to prove that the act charged was committed with reference to such ticket or ballot, which may be rebutted by proof that the act was not committed with reference to the election of a representative in congress. This construction is supported, if not justified, by the language of section 21 of the act of 1870, (16 St. at Large, 145,) from which section 5514 was condensed by the revisers. Section 21 reads:

"And be it further enacted, that whenever, by the laws of any state or territory, the name of any candidate or person to be voted for as representative or delegate in congress shall be required to be printed, written, or contained in any ticket or ballot with other candidates or persons to be voted for at the same election for state, territorial, municipal, or local officers, it shall be sufficient *prima facie* evidence, either for the purpose of indicting or convicting any person charged with voting, or attempting or offering to vote, unlawfully, under the provisions of the preceding sections, or for committing either of the offenses thereby created, to prove that the person so charged or indicted, voted, or attempted or offered to vote, such ballot or ticket, or committed either of the offenses named in the preceding sections of this act with reference to such ballot. And the proof and establishment of such facts shall be taken, held, and deemed to be presumptive evidence that such persons voted, or attempted or offered to vote, for such representative or delegate, as the case may be, or that such offense was committed with reference to the election of such representative or delegate, and shall be sufficient to warrant his convic-

tion, unless it shall be shown that such ballot, when cast, or attempted or offered to be cast, by him, did not contain the name of any candidate for the office of representative or delegate in the congress of the United States, or that such offense was not committed with reference to the election of such representative or delegate." *U. S.* v. *Bowen*, 100 U. S. 508.

It remains to be considered whether the acts charged in the affidavit might naturally and reasonably, and within the meaning of the statute, affect the election of a representative in congress; and it is said that they might do so by destroying or impairing the value of the tally-papers as ‚evidence before the board of canvassers, or in any contest of the election of such representative. It is claimed that on account of erasures and changes apparent on the tally-paper in the vote for coroner and criminal judge, it might be wholly rejected, or accepted only upon evidence *aliunde* that the vote for representative in congress, in which there are no erasures or changes, was correctly stated, and that the person elected as such representative might thereby lose, or be put to great trouble and expense in proving, his election. The legal presumption as to such erasures and changes is that they were made before the paper was signed, and the presumption is not to be overthrown by mere suspicion. But, if there is reason to believe that the erasures and changes in the statements of the vote for coroner and criminal judge were fraudulently made, it is not a sufficient reason for declining to accept the statements of the votes for other officers in which there are no erasures or changes. *Little* v. *Herndon*, 10 Wall. 26; Greenl. Ev. § 566; *Lewis* v. *Commissioners, etc., Marshall Co.*, 16 Kan. 102; *Cochran* v. *Nebeker*, 48 Ind. 459.

A tally-paper contains a separate statement of the votes cast for each candidate for every office, and, although it is one in form, it is several in its essence and character. The choice of a majority of the voters in a county or district or state, as to other offices, about which there is no reasonable question or doubt, ought not to be reversed by the rejection of the whole tally-paper, and the vote evidenced thereby, or held in abeyance, because there is some question or doubt as to the vote for coroner or criminal judge. It would be unreasonable to presume, if the election of governor hinged upon the vote of any of the precincts named in the affidavit, that any honest or intelligent man, or body of men, would reject its vote, and give the office to the candidate of the minority of the voters of the state, on account of these erasures and changes, and it would be impossible to justify such an act. It was to prevent such acts of ignorance or perversity that the legislature of Indiana inserted the following sections in the statute governing elections:

"Sec. 4720. No tally-paper, poll-book, or certificate returned from any election by the board of judges thereof, shall be rejected for want of form, nor for lack of being strictly in accordance with the directions herein contained, if the same can be satisfactorily understood; and such board of canvassers shall in no case reject the returns from any precinct if the same be certified by the board of election of that precinct as required by law, and presented to them by the inspector or one of the judges of said board."

"Sec. 4722. No commission shall be withheld by the governor on account of any defect or informality in the return of any election to the office of the

secretary of the state, if it can, with reasonable certainty, be ascertained from such returns what office is intended, and who is entitled to such commission.

The acts of the defendants had "exclusive reference to the election of state and county officers," and for such acts they are not and cannot be made "amenable to federal jurisdiction," because others might improperly or wrongfully make them a pretext for refusing to count the vote for representative in congress. The specific facts stated in the affidavit, which were admitted on the argument to be all the facts in the case, do not constitute an offense against the United States, and the commissioner was therefore without jurisdiction to conduct the examination, and Perkins was guilty of no contempt in refusing to be sworn and testify as a witness.

An order or judgment of a court, acting within its jurisdiction, punishing a party or other person for contempt of its authority, cannot be reviewed or annulled by another court; but if a court, having no jurisdiction over the parties or the subject-matter before it, sentences a party, a witness or any other person to imprisonment for contempt of its authority, the person thus illegally deprived of his liberty may be released by any court authorized to issue writs of *habeas corpus*. *Ex parte Fisk,* 113 U. S. 713, 5 Sup. Ct. Rep. 724; *In re Morton,* 10 Mich. 208; *In re Hall,* Id. 210; *Holman* v. *Mayor, etc.,* 34 Tex. 668; *People* v. *Cassels,* 5 Hill, 164; *Rutherford* v. *Holmes,* 5 Hun, 317; *Ex parte Burford,* 3 Cranch, 448; *Ex parte Bollman,* 4 Cranch, 75; *In re Buell,* 3 Dill. 116; *In re Henrich,* 5 Blatchf. 414; *In re Stupp,* 12 Blatchf. 501; *In re MacDonnell,* 11 Blatchf. 170.

But, even if the facts charged gave the commissioner jurisdiction to proceed with the examination, the question whether he was authorized to sentence Perkins to imprisonment in the county jail for the period of three months remains to be considered. Section 627 of the Revised Statutes of the United States, which provides for the appointment of commissioners, is as follows:

"Each circuit court may appoint, in different parts of the district for which it is held, so many discreet persons as it may deem necessary, who shall be called 'commissioners of the circuit courts,' and shall exercise the powers which are or may be expressly conferred by law upon commissioners of circuit courts."

The power to punish for contempt is nowhere expressly conferred on commissioners. It is claimed, however, by counsel for the government, that the provisions in section 1014, that offenders against the United States may be arrested, imprisoned, or bailed by the officers therein named, (among whom are commissioners,) "agreeably to the usual mode of process against offenders" in the state where they are found, confers on these officers all the powers of a justice of the peace, sitting as an examining magistrate under the laws of Indiana, among which is the power to punish for contempt. Article 35 of the Statutes of Indiana, defining contempts of court, and authorizing a maximum fine of $500 and a maximum imprisonment of three months, is cited as applicable to justices of the peace in such cases. But its provisions for a statement

by the "judge" of the acts or words constituting the contempt, for exceptions and bills of exceptions, as in other criminal actions, and direct appeals to the supreme court, show that article 35 does not apply to justices of the peace, and I do not understand that counsel now seriously insist that it does. McDon. Treatise, (Ed. 1871,) 106, 375; Id. (Schrader's Ed.) 388, 390; *Green* v. *Aker*, 11 Ind. 223; *Garrigus* v. *State*, 93 Ind. 239; *State* v. *Commissioners Vanderburgh Co.*, 49 Ind. 457.

Under section 1477 of the Statutes of Indiana, justices of the peace undoubtedly have power to enforce the attendance of witnesses, and to preserve order in judicial proceedings before them, by fine not exceeding $5 and imprisonment not exceeding three hours; but further consideration of their powers is unnecessary, because we look to the statutes of Indiana only to ascertain the mode in which powers that are expressly conferred on commissioners by the federal statutes shall be exercised. Section 1014 of the federal statutes expressly confers on commissioners the power to arrest, imprison, or bail offenders against the United States, and it also prescribes the manner in which this power shall be exercised, which is "agreeably to the usual mode of process against offenders" in the states. It is not essential to the due exercise of this power that commissioners should have authority to punish for contempt; for they can refer the contumacy of witnesses to the court, as they do in taking depositions, and as masters in chancery and registers in bankruptcy are required to do. It is just as important to have the answers of witnesses enforced in civil as in criminal proceedings, and there is no reason why the power to enforce such answers should be denied to officers having charge of the one, and conceded to those having charge of the other. It was the intention of congress to assimilate the proceedings before commissioners and other officers mentioned in section 1014, for holding accused persons to answer before the courts of the United States, to the proceedings for similar purposes in the states where such proceedings are had. *U. S.* v. *Rundlett*, 2 Curt. 41. But it is a stretch of language to say that the punishment of a witness for contempt by a commissioner is a necessary part of the "usual mode of process against offenders," or essential to the exercise of any power that is expressly conferred on him by the federal law. Much of the fallacy in the reasoning on this subject is founded on the assumption that a commissioner holds a court. The assumption is unsound and misleading. In *U. S.* v. *Case*, 8 Blatchf. 250, WOODRUFF, J., said: "The commissioner holds no court. He acts as an arresting, examining, and committing magistrate." He is designated as an "examining and committing magistrate" by Mr. Justice FIELD in *U. S.* v. *Schuman*, 2 Abb. U. S. Pr. 523, and in other cases cited by the government. It was held by Justice STORY (*U. S.* v. *Clark*, in 1 Gall. 497) that a district judge sitting as an examining and committing magistrate under section 33 of the judiciary act of 1789, which has been carried forward into the Revised Statutes as section 1014, was not a court; and that an indictment for perjury founded upon a statute requiring the offense to have been committed in a "court of the United States" was bad because it charged the act of perjury to have

been committed in an examination before a district judge under that section. In delivering his opinion, Justice STORY characterized the argument that a judge, under these circumstances, was a court, as "utterly insupportable."

It is not necessary to decide whether a justice of the supreme court of the United States, or a circuit or district judge, sitting as an examining magistrate, may punish a contumacious witness or other person guilty of misconduct before him. It is sufficient in this case to hold that commissioners exercise such powers as are expressly conferred on them by congress, and that neither section 1014, nor any other federal statute, authorizes them to punish for contempt. If, under section 1014, the commissioners have power to punish for contempt as an incident to their power to act as examining magistrates, it follows that officers of this inferior grade may exercise the power without restriction, although congress has deemed it necessary, in section 725, to restrict the supreme court of the United States and the circuit and district courts in the exercise of the same power.

It has been the practice throughout the country for commissioners to refer to the circuit courts, whose officers they are, parties, witnesses, and others guilty of contumacious conduct before them for punishment, and the action of Commissioner Van Buren is certainly unsupported by any precedent in this circuit.

The judgment of the district court denying the application of the petitioner to be discharged, and remanding him to the county jail, must be reversed, and the petitioner discharged from custody.

---

The opinion rendered in the district court in the preceding case is as follows:

(December 28, 1886.)

WOODS, J. The petitioner was committed by a United States commissioner for contempt in refusing to be sworn as a witness in an examination pending before the commissioner upon an affidavit charging, or purporting to charge, certain persons named, and who had been arrested and brought before the commissioner, with a violation, in pursuance of a criminal conspiracy, of the federal criminal statutes in respect to the elective franchise. The reason given by the petitioner for refusing to be sworn was that the commissioner was acting without jurisdiction, and his counsel here insist upon the same proposition.

In respect to the nature of the office, powers, and duties of United States commissioners, I quote from an opinion of Justice FIELD of the supreme court, delivered on the circuit in California, in the case of *U. S.* v. *Schumann,* 2 Abb. U. S. Pr. 523, on the question of the district attorney's right to dismiss a case before a commissioner over the latter's objection: "The office of commissioner was created by the act of February 20, 1812, and his duties were at first limited to taking acknowledgments of bail and affidavits. By several subsequent acts his powers have been greatly enlarged. Among other things, he is invested with all the authority to arrest, imprison, or bail offenders against the laws of the United States which any justice of the peace or other magistrate

of any of the United States can exercise under the thirty-third section of the judiciary act of 1789. That section provides that 'for any crime or offense against the United States the offender may, by any justice or judge of the United States, or any justice of the peace or other magistrate of any of the United States where he may be found, agreeable to the usual mode of process against offenders in such state, and at the expense of the United States, be arrested, imprisoned, or bailed, as the case may be, for trial before such court of the United States as by this act has cognizance of the offense.' The same act also authorizes the commissioner, upon any hearing before him when the offense is charged to have been committed on the high seas or elsewhere within the admiralty and maritime jurisdiction of the United States, in his discretion to require a recognizance from witnesses for their appearance at the trial. He is thus a magistrate of the government, exercising functions of the highest importance to the administration of justice. He is an examining and committing magistrate, bound to hear all complaints of the commission of any public offense against the laws of the United States in his district, to cause the offender to be arrested, to examine into the matters charged, and summon witnesses for the government and for the accused, and to commit for trial according to whether the evidence tends or fails to support the accusation. For the faithful discharge of his duty in these particulars he alone is accountable. He has no divided responsibility with any other officer of the government, nor is he subject to any other's control."

This view is fully sustained in the case of *U. S.* v. *Scroggins*, 3 Woods, 529, where it is held, in effect, that a commissioner, as an examining magistrate, has the powers, and derives them from the same source, as the chief justice or other justices or judges of the United States would have when acting in the same capacity.

Clothed with such powers, the commissioner must in every instance determine judicially whether a charge laid before him is sufficient in form and substance to justify an arrest and investigation. This power and duty to decide, when invoked, is jurisdiction; and, if the commissioner determines to proceed and does proceed with the hearing, I have no doubt of the rule, and believe no authority has been cited to the contrary, that no witness or person having only a collateral or indirect interest can question the jurisdiction, unless the affidavit on which the proceeding is based is so wanting in substance and in relevancy to any form of crime denounced by the statutes as to afford no reasonable color for an investigation. On this subject see *Ex parte Watkins*, 3 Pet. 193; *Ex parte Parks*, 93 U. S. 18; *Ex parte Yarbrough*, 110 U. S. 651, 4 Sup. Ct. Rep. 152; *Lange* v. *Benedict*, 73 N. Y. 12; *Dequindre* v. *Williams*, 31 Ind. 456; *Williamson's Case*, 26 Pa. St. 9.

Especially must this be the rule in respect to examinations held in Indiana, and governed, as examinations by United States commissioners sitting here are, by the statutes of the state in respect to such proceedings. By section 1639 of the Indiana Revised Statutes of 1881, if, "while a preliminary examination is had before a justice of the peace of any person upon a charge of felony or any other public offense, it appears to such justice that a mistake has been made in charging the proper offense, or that he is guilty of an offense not charged, the justice shall not discharge the defendant, if there appears to him to be good cause to detain him in custody; but he must cause an affidavit charging the proper offense to be made against the defendant, and recognize him to answer the same, and, if necessary, also recognize the witnesses to appear and testify." These provisions are futile if, while the examining officer turns his investigation from the insufficient and ill-conceived charge to the proper and well-drawn affidavit, prepared under his direction, witnesses may withdraw, or refuse to be sworn, on the pretense that jurisdiction had not been obtained under the first charge, or had been lost in the course of the change to the second.

But it is claimed that the alterations and erasures of tally-sheets and poll-books shown by the affidavit in question cannot support a charge of crime under any provision of the federal statutes, because it is affirmatively shown in the affidavit that the alleged changes, erasures, and everything done, and that the accused are charged with having conspired to do, did not, could not, and were not intended to affect the election of representative in congress, but only the election of certain local officers,—criminal judge and coroner of Marion county, and perhaps a member of the state legislature. If this proposition be completely true, it follows that the affidavit charges, and, consistently with the facts stated in it, could not have been so amended as to charge a violation of federal law, and possibly the commissioner was acting without jurisdiction or color thereof; though that does not seem to me to follow necessarily, because, doubtless, amendments relevant to the general subject, though inconsistent with the facts as first stated, might be made, if justified or required by the proof; as, for instance, the evidence before the commissioner in this case shows a removal of the tally-papers from lawful custody, and an omission of duty by the official custodians warranting an amendment which would bring the charge into substantial conformity with charges which were upheld in *Ex parte Clarke*, 100 U. S. 399. But, assuming the proposition as advanced to be true, we come, upon the theory of counsel, to the pivotal point of the argument: Do alterations of tally-sheets and poll-books, such as are here charged, affect, or, under possible and reasonably supposable states of fact, could they affect, the election of representative in congress?

The only instance within my knowledge in which this question has been presented to a court for decision was in the case of *Mackin* v. *U. S.*, tried two years ago in the United States district court for the Northern district of Illinois. For the judge's charge to the jury at the trial, see Chicago Legal News of February 28, 1885; and see 23 Fed. Rep. 334. The criminative acts charged to have been committed in that case in pursuance of the alleged conspiracy consisted in the change of a tally-sheet and appended certificate, after deposit in the clerk's office, and before the official count, in respect to the number of votes cast for opposed candidates for state senator, and in the substitution of forged ballots corresponding to the changed tally-sheet, instead of a like number of the true ballots returned therewith. The ruling of Judge BLODGETT, as I understand his charge, was that, under the circumstances alleged in the information before him, such an alteration or forgery of a tally-sheet was punishable under section 5403, 5511, or 5512 of the federal revised statutes.

I read an extract from the charge, which supplies a succinct statement of the substance and bearing of the sections named: "By section 5512, Rev. St. U. S., it is made an offense against the United States for any person who has any duty to perform in relation to an election of representative to congress, or in ascertaining the result thereof, or in giving any certificate or document in relation thereto, to knowingly violate any such duty, or to do any act unauthorized by law relating or affecting such election, or the result thereof, and for any person to aid, counsel, procure, or advise any such violation of duty. Section 5511, Rev. St. U. S., makes it an offense against the United States for any person knowingly to interfere with an officer of election at which a representative to congress is elected, or by any unlawful means induce any officer of such election whose duty it is to ascertain, announce, or declare the result of such election, or make any certificate, document, or evidence in relation thereto, to violate or refuse to comply with his duty, or any law regulating the same; while section 5403 makes it an offense for any person to willfully destroy any paper, document, or record deposited in any public office. The statutes of Illinois impose upon the county clerk, and upon his deputies, the duty of safely keeping all the poll-books, tally-sheets, and ballots delivered to them by the judges of election. The county clerk and his deputies were there-

fore persons having a duty to perform in regard to this election for representative to congress. So you will readily see that the offense charged in this case is a conspiracy on the part of all these defendants to violate section 5512, by inducing defendants Biehl and Gleason, who had a duty to perform in regard to these evidences of the result of this election, to neglect to perform such duty, and by conspiracy to aid, counsel, procure, or advise such officers to neglect their duty, and thereby enable some person to spoliate and destroy the evidences of this election; also to violate section 5511 by conspiring to induce the county clerk or the county returning board to make a false canvass and certificate of the result of said election,—that is, by altering returns before the day of canvass came, to give the county clerk the means of making a false return of the election; also to violate section 5403 by conspiring to destroy a paper, to-wit, the poll-book, tally-sheet, and ballots, which were properly deposited in the office of the county clerk; the office of such clerk being a public office wherein such poll-books, tally-sheets, and ballots are properly deposited for the purpose of furnishing the proof authenticating the election of a member of congress, and for that purpose the office of county clerk of this state is a public office of the United States. When the certificates of the result of an election for a member of congress, or any other office, for that matter, is altered in any material particular, such certificate is legally destroyed, and is no longer evidence of what it originally stated. It is no longer the document which the judges and clerks signed, but it is a different document, and it makes a different statement."

Now, if it be conceded, as here stated, that, when a certificate or tally-sheet is altered in any material particular, it is legally destroyed, and is no longer evidence of what it originally stated, the conclusion is clear that the election in respect to representative in congress is affected, because an item of evidence in respect thereto, a muniment of title to the seat in congress, has been destroyed.

But suppose it too much to say that the document, as a whole, in legal contemplation, has been destroyed, it is still manifestly true that its integrity and force as evidence are impaired. If the alteration be manifest on the face of the papers, and no explanation given over the signatures of the signers, any party proposing the document as evidence of his rights, I suppose, would be under the necessity of showing *aliunde* that in other respects the instrument is genuine and true; and under such a burden of proof a party to a close contest, it is easy to understand, might lose a seat in congress to which he was justly entitled. And, if the alteration be more skillful and not apparent, it may be the source of more serious uncertainty and trouble. If, for instance, in the case before us, we suppose the ballots returned with the duplicate tally-sheets lost or destroyed, or other ballots substituted which would show a different result in respect to congressman, and, in addition, suppose that the other tally-sheets, with which these altered ones ought to correspond, be found to have been altered in respect to the congressional vote, is it not manifest that in case of dispute, each alteration would be an obstacle in the way of determining the true result of the election, because each tally-sheet would tend to discredit the other? And this would be the effect in respect to congressman as well as in respect to other officers.

To illustrate further by this case: I understand that some members of the board of canvassers, on account of the apparent changes in these tally-sheets and poll-books, refused to sign, and others signed under protest, the certificate of the result of the election in Marion county, including candidates for congress as well as for all local offices. This was an actual, tangible effect upon the election; and, if other members of the board of canvassers had acted in the same way, the vote of Marion county in respect to congressman might

not have been declared without further proceedings, and possibly not without litigation.

But the suggestion has been made that the affidavit here shows the authenticity and truth of the altered papers in respect to the election of congressman, and therefore a supposition to the contrary is inadmissible. The plain answer to this is that the accused are charged with having done forbidden things, which, unexplained, impair the proof in respect to the congressional election, and they are no less guilty because the truth of the matter may have been discovered or determined before the formal charge was framed and the prosecution instituted.

Going no further into the discussion, I am clear that this affidavit charges an offense or offenses fully within the rightful cognizance of congress, and am equally clear that the provisions of sections 5511 and 5512 are applicable; and, if the charge as made is in any respect defective, the fault is of form rather than of substance, and affords no ground for raising a question of jurisdiction.

Whether or not section 5403 could be made to apply, I am not sure, because uncertain whether any of these tally-sheets or poll-books had been "deposited" with an officer, or in a public office, within the meaning of that section.

The proceedings before the commissioner not having been without jurisdiction, the petitioner, of course, had no right, on that ground, to refuse to be sworn as a witness.

In respect to the length of time for which the petitioner was committed, I do not think the commissioner exceeded his power. By section 1477 of Indiana Revised Statutes of 1881, which section was enacted in 1853, a justice of the peace was empowered "to subpœna witnesses and enforce their attendance by attachment and fine not exceeding five dollars; to enforce order * * * by fine not exceeding five dollars, and imprisonment not exceeding three hours." And by section 1436, enacted at the same time, there was given to justices "jurisdiction co-extensive with the county to administer oaths, issue subpœnas, and attachments for contempt, in any cause pending before them, or in any matter where they may be authorized to take testimony." But in 1879, by an act designed apparently to regulate the entire subject of contempts of court, it was enacted that "every person who, being sworn to testify as a witness in any court of record, in any trial or proceeding therein, shall refuse to testify touching the same, or who, being required by any court to be sworn in any such trial or proceeding, shall refuse to take an oath or affirmation therein, * * * shall be deemed guilty of a direct contempt thereof." And in the same act it is provided that punishment for contempts of court under the act may be by fine or imprisonment, or both; the fine not to exceed five hundred dollars, and the imprisonment not to extend beyond the term of three months. Rev. St. 1881, §§ 1006, 1010. These provisions, in my judgment, define the powers of justices of the peace in this respect, because, as the supreme court of the state has often decided, the courts of justices of the peace are courts of record. But if, for any reason, the act of 1879 ought to be construed to embrace only courts of higher and more general jurisdiction, justices may still punish contempts (excepting the particular instances provided for in section 1477) under section 1436, which puts no limitation upon the fine or imprisonment which may be imposed. *Quære* whether United States commissioners are under the same restrictions as justices of the peace in respect to punishments for contempts.

But, in any view, the necessary conclusion is that the petitioner was not unlawfully committed, and should be remanded, unless now willing to purge himself of contempt, in which case he may be taken before the commissioner for that purpose.

Appeal prayed to circuit court, and granted.