FIDELITY TITLE & TRUST CO. AND MIRIAM G. HOSTETTER, EXECUTORS UNDER THE WILL OF D. HERBERT HOSTETTER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 2795.   Promulgated February 2, 1928.

*H. F. Stambaugh, Esq.*, for the petitioners.
*L. C. Mitchell, Esq.*, for the respondent.

485

OPINION.

PHILLIPS: Counsel argues that the deficiency here involved was assessed prior to the effective date of the Revenue Act of 1924 and that under the decisions of the United States District Courts in *United States* v. *Cabot*, 5 Am. Fed. Tax Rep. 6172, and *United States* v. *Whyel*, 19 Fed. (2d) 260, the provision of the Revenue Act of 1924 which granted six years from the date of assessment in which to collect had no application. It is, therefore, contended that it was necessary that collection be made within five years from the date on which the return was filed.

Petitioner's contention is based upon the erroneous assumption that the deficiency was assessed before the effective date of the Revenue Act of 1924. They rely upon the letter of May 23, 1923, as constituting an assessment. The letter upon its face indicates that assertion of the additional tax liability is tentative and not a final action and that pursuant to the provisions of section 250(d) of the Revenue Act of 1921 an appeal might be filed within 30 days. That section, so far as here material, provides:

If upon examination of a return made under * * * the Revenue Act of 1918, * * * a tax or a deficiency in tax is discovered, the taxpayer shall be notified thereof and given a period of not less than thirty days after such notice is sent by registered mail in which to file an appeal and show cause or reason why the tax or deficiency should not be paid. Opportunity for hearing shall be granted and a final decision thereon shall be made as quickly a prac-

ticable. Any tax or deficiency in tax then determined to be due shall be assessed * * * : *Provided,* That in cases where the Commissioner believes that the collection of the amount due will be jeopardized by such delay he may make the assessment without giving such notice or awaiting the conclusion of such hearing.

There is nothing to indicate that the Commissioner believed that the collection of the additional tax would be jeopardized by the delay or that any assessment was made on that ground. On the contrary the letter clearly indicates that the petitioner was granted 30 days in which to file an appeal and show cause or reason why the additional tax should not be paid. Under the provisions of the law no assessment was to be made until this hearing was had, except where jeopardy existed. The letter uses the words "this assessment" and it is upon these words that the petitioners rely. Reading the letter as a whole, however, it is clear that it did not constitute a final action and that it was a step preliminary to assessment.

There is a further ground upon which it would be necessary to determine that the letter of May 23, 1923, is not an assessment. Under the provisions of the various revenue acts imposing income taxes, the portions of the Revised Statutes which relate to the assessment and collection of tax are made applicable. (Section 1300 of the Revenue Act of 1921 and section 1000 of the Revenue Act of 1924.) Section 3182 of the Revised Statutes provides in part:

The Commissioner of Internal Revenue is hereby authorized and required to make the inquiries, determinations and assessments of all tax and penalties, * * * and shall certify a list of such assessment when made to the proper collectors, respectively, * * *.

The only person authorized to make an assessment is the Commissioner of Internal Revenue or, under certain circumstances, an Acting Commissioner. While the determination of the amount of any tax must be left in the usual case to others, the action which constitutes the assessment must be the act of the Commissioner. The letter of May 23, 1923, upon which the petitioners rely as constituting an assessment of tax, is not and does not purport to be an action by the Commissioner. It is signed by a deputy and it informs the taxpayer of the action which subordinates in the office of the Commissioner will recommend that the Commissioner take. The taxpayer is advised that he may file his appeal, which appeal will be considered by such agents as the Commissioner may designate for final consideration. Presumably the Commissioner will act upon the recommendation of the agency to which he recommends it for such consideration but until the Commissioner acts there has been no assessment.

Even if it could be conceded that an assessment had been made prior to the effective date of the Revenue Act of 1924, it would still

appear, under the decision of this Board in *Art Metal Works* v. *Commissioner*, 9 B. T. A. 491, that the provisions of the Revenue Acts of 1924 and 1926 with respect to collection apply and that under section 278 (d) of those Acts there would be six years within which to collect.

(2) It appears that prior to March 1, 1913, taxpayer acquired 167 shares of stock of the Allegheny Heating Co. at a cost of $19,640 and that in 1919 he exchanged this stock for stock of the Philadelphia Co. of an agreed value of $96,112. In making his return the taxpayer asserted that the March 1, 1913, value was in excess of $96,112 and claimed a loss. Since the return was filed and since the petition herein was filed the Supreme Court in *United States* v. *Flannery*, 268 U. S. 98; 45 Sup. Ct. 420; 5 Am. Fed. Tax Rep. 5373, has determined that a loss is not to be based solely upon the March 1, 1913, value and can be claimed only if and to the extent that there is an actual loss. Under that decision it is clear that the respondent properly disallowed the loss claimed. In an amended answer filed prior to the hearing, the Commissioner alleged that the value of the stock of the Allegheny Heating Co. on March 1, 1913, was less than the value of the stock received in exchange and that the taxpayer realized a gain. The evidence, however, does not sustain these allegations. It discloses that for some years prior to 1913 the Allegheny Heating Co. had net earnings of approximately $50 per share and that it paid dividends of 44 per cent in 1908, 42 per cent in 1909, 50 per cent in 1910, and 55 per cent in 1911 and in 1912. The evidence is not such as to indicate that on March 1, 1913, there was any reason to believe that such earnings would decrease. In fact, they increased in subsequent years. There were no sales of the stock of this company and we must look to this record of earnings and dividends for the determination of value. Considering this record and also considering that this company was operating as a public utility and that its business was stable, we see no reason for disturbing the determination of $603.13 originally made by the Commissioner. Certainly the evidence is insufficient to justify us in fixing the value of $440 per share for which his counsel now contends.

(3) This brings us to a consideration of the March 1, 1913, value of the bonds of the Consolidated Gas Co. of Pittsburgh. Prior to March 1, 1913, the taxpayer had acquired a total of $560,000 par value of such bonds at a cost to him of $577,524.42. These were exchanged in 1919 for preferred stock of the Philadelphia Co. having an agreed value of $347,060. There was here an actual loss of $230,464.42, but since the March 1, 1913, value was less than the cost, the deductible loss is limited to the difference between such March 1, 1913, value and the value of the stock received in exchange. The Commissioner determined the March 1, 1913, value to be $700.

This is the price at which two lots, each of ten of such bonds, were sold early in 1913. Conceding that such sales may not satisfactorily establish the market price of such a block as was owned by the taxpayer, the record fails to establish a greater value. There were $5,000,000 par value of these bonds outstanding in 1913. They were secured by a mortgage upon all of the assets of the Consolidated Gas Co., including $2,000,000 par value of the bonds and $2,000,000 par value of the stock of the Allegheny Illuminating Co., owned by the Consolidated Gas Co., being all of the stock and bonds of the Illuminating Co. The principal assets of these companies were real estate, franchises and mains. Through franchises which it owned or which it controlled by the ownership of such stock and bonds, the Consolidated Gas Co. had an exclusive right to manufacture and sell artificial gas for lighting, heating, and fuel in the City of Pittsburgh and the former City of Allegheny and in 1913 was supplying all the illuminating gas sold in the city. Natural gas, however, had been introduced into the city and was being sold by other companies for heating and fuel. It could be supplied at a less cost than artificial gas. Electricity was taking the place of gas for lighting purposes. The income and profits statements of the Consolidated Gas Co. show that it was not earning interest on its bonds and had not done so for some time.

All of the common stock of the Consolidated Gas Co. was owned by the Philadelphia Co. It also appears that the latter company owned the stock of one or more of the companies supplying natural gas and of the company supplying electricity. It owned a large tract of oil and gas producing property. In 1907, as the result of differences which had arisen between holders of the 6 per cent cumulative preferred stock of the Consolidated Gas Co. and the Philadelphia Co. with respect to the operation of the former company, the latter company had guaranteed dividends of 4 per cent upon such preferred stock, and this guarantee had been accepted by the owners of about 75 per cent of the $2,000,000 par value of outstanding preferred stock. It is urged in substance that we should assign some substantial value to the franchises and mains of the Consolidated Gas Co. and of the Allegheny Illuminating Co., which value should be added to the value of certain parcels of real estate for the purpose of determining the intrinsic value of the bonds. The evidence is not sufficient to indicate that the franchise had any value, or what, if any, value the mains had. The annual losses of the company were substantial. The use of gas for lighting was decreasing and natural gas for heating and fuel could be sold for less. Whether the mains of the natural gas companies paralleled those of the Consolidated Gas Co. we do not know. What their value might have been to a company supplying natural gas or for the purpose of

combining with such a company, is not shown, but it seems evident that the Consolidated Gas Co. could not have hoped in 1913 to continue alone successfully.

Petitioners point out that the Philadelphia Co., which operated a natural gas company, owned all the stock of the Consolidated Gas Co. and had guaranteed dividends of 4 per centum upon its preferred stock, totaling $2,000,000 par value, and argues that the Philadelphia Co., in the event of a foreclosure of the mortgage, would not have permitted this property to have been purchased by another and desired to acquire it for itself in order to increase its hold on the public utilities of the city. It is equally conceivable that the Philadelphia Co. would so operate the Consolidated Gas Co. as to depreciate the value of its bonds, that they might 'be acquired at a lower price. It seems that there may have been some ground to fear such a step, for it was after the preferred stockholders had raised some question as to the method of operation that the Philadelphia Co. had guaranteed dividends of 4 per cent per annum upon this stock. Furthermore, it appears that in 1916 the company ceased to pay interest on these bonds and acquired them in 1919 for much less than $700 per bond. We are not of the opinion that the relationship of the Philadelphia Co. to the Consolidated Gas Co. served to increase materially the value of its bonds.

The March 1, 1913, value fixed by the Commissioner for $5,000,000 par value of these bonds outstanding was $3,500,000. The real estate securing them, owned by the Consolidated Gas Co. or by the Allegheny Illuminating Co., was worth approximately $3,100,000. In attempting to fix an intrinsic value for the bonds we must consider the possibilities of foreclosure with its expenses and loss of interest. We see nothing in the record which would justify us in increasing the value beyond that fixed by the Commissioner.

> *The deficiency is redetermined to be the amount determined by the Commissioner, and decision will be entered accordingly.*