F. A. GILLESPIE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 18993, 19832, 19833, 30639. Promulgated September 30, 1930.

*John E. Hughes, Esq.*, and *William Cogger, Esq.*, for the petitioner.

*Eugene Meacham, Esq., C. E. Lowery, Esq.*, and *C. R. Marshall, Esq.*, for the respondent.

1074

OPINION.

ARUNDELL: Petitioner's claims are (1) that the statute of limitations bars collection of the assessments for 1917 and 1918 and bars assessment and collection of the deficiencies for 1919 and 1920, and (2) that the statute had run on June 15, 1928, and that he is entitled to recover the $690,000 paid on that date. Under each of these claims several contentions are made which, as far as they are deemed material, will be discussed as we progress with this opinion. We will consider first the limitations questions for the several years in the same order as set out in the findings of fact.

1917

Petitioner's return was filed not later than April 5, 1918. Thereafter waivers were executed which may briefly be described as follows:

| Date of waiver | Collection or assessment | Period of extension |
|---|---|---|
| Feb. 10, 1921 | Assessment | Indefinite. |
| Dec. 8, 1923 | Assessment and collection | 1 year from signing. |
| Nov. 22, 1924 | ____do____ | Do. |
| Nov. 18, 1926 | Assessment | To Dec. 31, 1927. |
| Nov. 17, 1927 | Collection | To Dec. 31, 1928. |
| Dec. 4, 1928 | ____do____ | To Dec. 31, 1929. |

The first waiver was of the character described in the Commissioner's mimeograph 3085 and which by virtue of that ruling expired on April 1, 1924. *Wirt Franklin*, 7 B. T. A. 636. Before that date the petitioner consented to an extension of time for assessment and collection for one year from December 8, 1923, or until December 8, 1924. Before the latter date, to wit on November 22, 1924, he agreed to another extension for assessment and collection which, by the terms of the waiver, ran until November 22, 1925. This waiver, though not signed by the Commissioner until December 13, 1924, is valid and served to extend the time under our decision in *Wells Brothers Co.*, 16 B. T. A. 79. At this point occurs a gap in the sequence of waivers. The next one, providing only for assessment, was not executed by the petitioner until November 18, 1926, and in the meantime the Revenue Act of 1926 was enacted, under section 1106 of which petitioner claims that his liability was extinguished and not revived by subsequent waivers, citing *Steiner Manufacturing Co.*, 18 B. T. A. 740, and *Jacobs Bros. Co.*, 19 B. T. A. 315. In the *Steiner* case the period for assessment expired on or before March 15, 1926. A consent to the extension of time for assessment was executed June 10, 1926, and the deficiency notice was mailed September 8, 1926. We held that the consent was ineffective to extend the time because prior to its execution both the right and the remedy had been extinguished by section 1106 of the Revenue Act of 1926, and that the repeal of that section by section 612 of the Revenue Act of 1928 did not revive a dead liability or create a new obligation. Similarly, in *Jacobs Bros. Co.*, where the time for collection had expired and a waiver extending the period for collection was executed while the Revenue Act of 1926 was in effect, we held that under section 278(e) of that act a waiver in order to be effective must be executed before the enactment of that act. The Revenue Act of 1928, which was en-

acted on May 29, 1928, in section 506 amends section 278 of the Revenue Act of 1926 by the following provisions:

SEC. 506. WAIVERS AFTER EXPIRATION OF PERIOD OF LIMITATION.

(a) Section 278(c) and (d) of the Revenue Act of 1926 are amended to read as follows:

"(c) Where before the expiration of the time prescribed in section 277 for the assessment of the tax, both the Commissioner and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

"(d) Where the assessment of any income, excess-profits, or war-profits taxes imposed by this title or by prior Act of Congress has been made (whether before or after the enactment of this Act) within the period of limitation properly applicable thereto, such tax may be collected by distraint or by a proceeding in court (begun before or after the enactment of this Act), but only if begun (1) within six years after the assessment of the tax, or (2) prior to the expiration of any period for collection agreed upon in writing by the Commissioner and the taxpayer before the expiration of such six-year period. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon."

(b) Section 278 of the Revenue Act of 1926 is further amended by adding at the end thereof a new subdivision to read as follows:

"(f) Any agreement which would be within the provisions of subdivision (c) or (d) of this section but for the fact that it was executed after the expiration of the period of limitation extended by such agreement, shall be valid and effective according to its terms if entered into after the enactment of the Revenue Act of 1928 and before January 1, 1929."

The present case falls squarely within the quoted provisions. Assessment was timely made, and under section 506 the collection waiver of December 4, 1928, must be held valid to extend the time for collection. In the cases above cited and relied on by the petitioner the waivers involved were executed by the taxpayers prior to the enactment of the Revenue Act of 1928, and accordingly that act did not apply to them. In our opinion there is no merit in the contention that, the tax liability having been extinguished by the Revenue Act of 1926, it could not be revived in the manner and under the circumstances provided in the 1928 Act. The case of *Danzer Co.* v. *Gulf R. R.*, 268 U. S. 633, cited by petitioner, is not in point. The decision in that case was put upon the ground that, in order to sustain the plaintiff's argument, the statute involved would need to be construed retroactively, so as to create liability. The case was a suit between private litigants and did not involve the taxing power of the United States. Such is not the case here. Congress, by the enactment of section 506, in effect said to taxpayers and the respond-

ent that, if after this act is passed an agreement extending the time is entered into, then the liability for taxes imposed by prior acts may be determined within the time agreed upon. Congress went much further than this, and its acts were sustained in *United States* v. *Heinzen & Co.*, 206 U. S. 370, and *Rafferty* v. *Smith, Bell & Co.*, 257 U. S. 226, in which it retroactively validated taxes which in the first instances were illegally imposed and collected. A similar argument attacking the validity of section 611 of the Revenue Act of 1928, made in *Reeves, Inc.* v. *Anderson,* —— Fed. (2d) ——, was disposed of by Judge Learned Hand in the following language, which is equally applicable to the section here under consideration:

Taxpayers in the plaintiff's position do indeed lose an immunity once acquired; they lost it,—we will assume arguendo,—by the mere fiat of the statute; Congress has seen fit in effect to impose the tax upon them de novo at a time long after the events took place on which it depends. This is charged to be in violation of the Fifth Amendment, and so it might be, if there had been no original tax, no claim for abatement, no delay of the Treasury in the disposal of that claim, and a consequent loss of all remedies. Were the Fifth Amendment a remorseless pattern which all legislation must fit, the argument might even so be troublesome; might indeed be conclusive. But constitutional limitations are not indifferent to the occasions of the statutes they affect. They represent a mood rather than a command, that sense of moderation, of fair play, of mutual forbearance, without which states become the prey of faction. They are not the rules of a game; their meaning is lost when they are treated as though they were. It is quite true that the section took away a defense from the plaintiff; he is right to complain unless we can question the kind of defense it was. The moment we do, it must appear to any fair person that he ought not to have it. What the Treasury lost through its procrastination, it lost forever, even though it was under an honest mistake as to its remedies. If the taxpayer did nothing to provoke or encourage its delay, perhaps it was fair that his liabilities once dead should not be revived; there is a deep instinct behind any statute of limitations. But if he asked for reconsideration because he had been unlawfully treated, and if his complaint was entertained, then by virtue of an equally deep instinct, it is unfair to allow him to treat that conduct as a fault which he was the means of procuring. He ought not in short to be able to avoid his share of the public burdens, because the authorities consented to give him a considerate hearing. It does not help to call the bar of the statute a vested right; that is at best a figure of speech, which does not hallow everything that is past, a default in pleading as well as a homestead. One's grip on an antagonist, enmeshed in a net of statutes, may be a vested right, but it is not a constitutional right.

As set out above, the facts in this case exactly fit in the provisions of section 278(f) of the Revenue Act of 1926, as amended by section 506(b) of the Revenue Act of 1928, and we hold that the waiver dated December 4, 1928, serves to extend the time for collection of additional tax assessed for 1917.

## 1918

Petitioner's final return for 1918 was filed with the collector not later than April 21, 1919. Waivers covering 1918 executed by petitioner were as follows:

| Date of waiver | Assessment or collection | Period of extension |
| --- | --- | --- |
| Dec. 8, 1923 | Assessment and collection | 1 year from signing. |
| Nov. 22, 1924 | do | Do. |
| Nov. 18, 1926 | Assessment | To Dec. 31, 1927. |
| Nov. 17, 1927 | Collection | To Dec. 31, 1928. |
| Dec. 4, 1928 | do | To Dec. 31, 1929. |

The first of these extended the time for assessment and collection to December 8, 1924, and the second to November 22, 1925. Here, as was the case with respect to the 1917 taxes, there is a break in the continuity, there being no waiver covering the period between November 22, 1925, and November 18, 1926, when the next waiver was executed. But here, too, there was a waiver executed on December 4, 1928, and this it must be held, as for the year 1917, was valid to extend the time for collection of the tax assessed for the year 1918.

## 1919

The parties are in agreement that petitioner's so-called " temporary return " filed on April 14, 1920, started the running of the statute of limitations. We concur in that view. The return so filed was on Form 1040, and, while it was not complete, it was more than a tentative return such as was involved in *Florsheim Bros. Dry Goods Co.* v. *United States*, 280 U. S. 453. The statute, then, if no waivers had been executed, would have run on April 14, 1925. The respondent's first step toward assessment and collection was the mailing of a deficiency notice on June 9, 1926, and the question is whether this was in time. The waivers relating to 1919 are as follows:

| Date of waiver | Assessment or collection | Period of extension |
| --- | --- | --- |
| Dec. 6, 1924 | Assessment and collection | 1 year from signing. |
| Nov. 13, 1925 | Collection | To Dec. 31, 1926. |
| Nov. 18, 1926 | Assessment | To Dec. 31, 1927. |
| Nov. 22, 1926 | Collection | Do. |
| Nov. 17, 1927 | do | To Dec. 31, 1928. |
| Do | do | To Dec 31, 1929. |

The first waiver extended the period for " determination, assessment and collection " to December 6, 1925. The next waiver, that of November 13, 1925, extended the time until December 31, 1926, " for the collection of the tax, or any portion thereof, assessed for said year [1919]." The obvious intent of this waiver was to apply

only to the tax which had been assessed at the time of its execution and not to taxes that might be assessed in the future. Had the parties intended it to cover future assessments they would undoubtedly have said so in it. The situation then is that after December 6, 1925, and until November 18, 1926, when the third in the series of waivers was executed, the respondent was without right to assess additional taxes for 1919. In this period the Revenue Act of 1926 was enacted and extinguished petitioner's liability for any further taxes. Assessment and collection of any deficiency were therefore barred when the notice of deficiency was mailed on June 9, 1926. The situation here is different from that with respect to 1917 and 1918 as no waiver was executed for 1919 after the enactment of the Revenue Act of 1928.

In our opinion, however, collection of the 1919 assessment made in June, 1920, was not barred in June, 1928. Under the statute and in accord with *Bowers* v. *New York & Albany Lighterage Co.*, 273 U. S. 346, and *Russell* v. *United States*, 278 U. S. 181, the period for collection, without waivers, would expire April 14, 1925, that is, five years after the return was filed. But collection waivers were given, the first one before expiration of the statutory period and which extended the period to December 6, 1925. On November 13, 1925, petitioner executed a second waiver of the period for collection extending the time to December 31, 1926, and this was signed by the respondent on January 4, 1926, before the enactment of the Act of 1926. Petitioner argues that this second waiver is invalid because it was not signed by the respondent until after the previous waiver had expired and because it contained a misrepresentation. The first argument is disposed of in *Wells Bros. Co.*, 16 B. T. A. 79, holding that it is not necessary to the validity of a waiver that it be executed before the expiration of the statutory period where the statute relates only to the remedy. The alleged misrepresentation complained of is a statement in the waiver form that one of the reasons for its execution is " to prevent the immediate institution of a proceeding for the collection of such tax prior to the expiration of the six year period of limitation after assessment * * * for the collection of the tax, as provided in Section 278(d) of the existing Revenue Act * * *." In the first place it has not been shown by petitioner that in executing the waiver he relied on the statement that there was a six-year period for collection, and, secondly, the statement is not a misstatement of fact upon which either of the parties could rely to rescind their agreement, but is merely an erroneous interpretation of the law which gave no rights to either. The holding of this waiver to be valid is not contrary to *Peerless Woolen Mills*, 13 B. T. A. 1119, and *Jacobs Brothers Co.*, 19 B. T. A. 315, in both of which

the bar of the statute had dropped before the 1926 Act was enacted and the collection waiver was not executed until in December, 1926. Following the execution of the waiver of November 13, 1925, there is an unbroken chain of waivers which carry the period for collection beyond June, 1928, when payment of $70,804.72 was made, and we accordingly hold that that amount is not an overpayment within the meaning of the Revenue Act of 1928.

## 1920

Petitioner's return for 1920 was filed not later than June 11, 1921. Unless extended by waivers the statute of limitations would have run on June 11, 1926. The deficiency notice for 1920 was mailed June 24, 1927, so that unless valid waivers were executed the respondent is barred from assessment and collection of the deficiency asserted. The waivers executed by petitioner were as follows:

| Date of execution | Assessment or collection | Period of extension |
| --- | --- | --- |
| Dec. 7, 1925 | Assessment | To Dec. 31, 1926. |
| Nov. 10, 1926 | do | (?) |
| Not dated [1] | Collection | To Dec 31, 1927 |
| Nov. 17, 1927 | do | To Dec. 31, 1928. |
| Do | do | To Dec. 31, 1929. |

[1] Bears collector's received stamp Jan. 7, 1927.

There is no difficulty about the first waiver as it was signed by both the petitioner and respondent well within the statutory period, and as no deficiency notice was sent before December 31, 1926, it extended the time only until that date. It is upon the next waiver— that bearing date of November 10, 1926, that the issue for 1920 turns. If that waiver extended the time to December 31, 1927, as claimed by respondent, then the notice of deficiency was timely. There are two apparent alterations on the face of this waiver. One of the alterations appears in the heading where the second "2" in "1922" has a "3" written over it, making the line read, "For taxable years prior to 1923." This alteration does not affect the validity of the waiver and is immaterial except as a background and serving to explain the circumstances under which the waiver was prepared and executed. The crucial question is whether "6" in "1926" which has been written over with a "7" in ink was so altered before or after the waiver was executed by the petitioner. The respondent produced this waiver and offered it in evidence as extending the period for assessment to December 31, 1927. If the alteration was made before the instrument was signed by the petitioner it is undoubtedly good for the purpose claimed by the respondent; if altered after petitioner's signature was affixed it does not extend the time beyond December 31, 1926, and the notice of deficiency was mailed too late.

Petitioner says that *Ofenstein* v. *Bryan*, 20 App. D. C. 1, lays down the rule of evidence by which we should be guided on this question. That case involved an altered negotiable instrument and holds that where the alteration in the note is material and such as reasonably to excite suspicion, the burden is on the party offering it to give some evidence tending to explain its condition. In its opinion the court points out that a rule applicable to such instrument may not be universally applicable, for example, there might be a different rule in the case of deeds. The opinion on this point ends with the statement that the trial court rightly rejected the note "without some proof in explanation of its suspicious appearance." In the case we have, both parties put in testimony in an endeavor to explain the alterations in the waiver and so we do not regard the case cited as controlling.

Authorities inform us that there is a conflict of opinion as to whether the presumption is that an alteration was made before or after the execution of an instrument. See *Bossio* v. *United States*, 16 Fed. (2d) 54, 56; Jones on Evidence (3rd Ed.) §563. The Supreme Court, in *Little* v. *Herndon*, 10 Wall. (77 U. S.) 26, which involved a tax deed having an erasure and interlineation on its face, held that:

In the absence of any proof on the subject the presumption is that the correction was made before the execution of the deed.

The court based this holding on an English case, which says:

This doctrine seems to us to rest on principle. A deed cannot be altered after it is executed without a fraud or wrong; and the presumption is against fraud or wrong.

*Hanrick* v. *Patrick*, 119 U. S. 156, which likewise involved a deed in which the name of the grantor had been altered, says:

The only erasure appearing being a change from one name to the other was sufficiently explained by the proof of identity. At any rate the presumption was that the erasure was made before the execution of the deed. *Little* v. *Herndon*, 10 Wall. 26.

*Rankin* v. *Tygard*, 198 Fed. 795, where a bank official's bond was in dispute and the claim was made that the bond had been altered after being signed by the sureties, holds:

While there is a conflict of authority on this question * * * the weight of reason and authority is that the legal presumption is that an alteration apparent on the face of an instrument in writing was made before its execution, and is therefore immaterial and the burden is not on the party who offers the instrument in evidence to explain the alteration, but it is on him who assails the instrument to prove that the alteration was made after its execution and that it is material. *Little* v. *Herndon*, *supra*; *Hanrick* v. *Patrick*, *supra*.

*Ex parte Perkins*, 29 Fed. 900, was a case in which it was charged that election officials had altered tally sheets. The court says:

The legal presumption as to such erasures and changes is that they were made before the paper was signed and the presumption is not to be overthrown by mere suspicion.

In *Wilson* v. *Hayes*, 40 Minn. 531; 42 N. W. 467, the court in a well considered opinion reaches the conclusion that:

The mere existence of an interlineation or erasure in an instrument would not naturally produce an impression in the minds of men that it had been fraudulently altered after execution * * *. We are therefore of opinion that the burden is upon the maker to say that the alteration was made after delivery; to state the proposition with more precision the proof or admission of the signature of a party to an instrument is prima facie evidence that the instrument written over it is his act and this prima facie evidence would stand as binding proof unless the maker can rebut it by showing by evidence that the alteration was made after delivery; * * *

Prior to the decisions in *Little* v. *Herndon* and *Hanrick* v. *Patrick*, *supra*, the Supreme Court had laid down the rule in *United States* v. *Linn*, 1 How. 104; and *Smith* v. *United States*, 2 Wall. 219, that where an alteration is apparent on the face of the instrument in suit the burden of explaining the alteration is on the party who claims under the instrument. The decision of *Ofenstein* v. *Bryan*, *supra*, cited by petitioner, seems to be based largely on these earlier decisions of the Supreme Court.

As stated above, a great deal of testimony was offered by both sides to explain the circumstances of the changes in the waiver, and we believe our decision on this point may well be rested entirely on the evidence produced by the parties and without resort to the presumption discussed in the cited cases.

The waiver here involved was offered in evidence as a part of respondent's cross examination of petitioner's secretary, who was a witness for the petitioner. She testified that the alteration had not been made when the waiver was signed by petitioner. However, upon further examination, it was developed that she had no independent recollection of the particular waiver involved and that her testimony with respect to the alteration was based on petitioner's general practice of handing the waivers to her, for mailing, after signing them. Her testimony then must be regarded as negative and amounting only to saying that she did not see any waiver in which the year had been changed, rather than as evidence of the alleged fact that this particular waiver was not altered before execution. Petitioner testified that the "7" in ink had not been written over the "6" when he signed the waiver. However, we find it difficult to accept this testimony as true. His memory on matters of dates, who held powers of attorney to represent him and other facts was

faulty. We were distinctly impressed with the fact that petitioner had no clear or independent recollection of this transaction. The waiver here in dispute was forwarded to the respondent by letter of transmittal signed by Guy T. Berry, to whom petitioner had previously given a power of attorney. The logical inference from these facts is that Berry was petitioner's representative when the disputed waiver was signed, and that petitioner signed it on his advice. Berry would most likely have read the waiver carefully before advising petitioner to sign and would be more apt to have noticed any changes than the petitioner, who knew little about tax matters and sometimes signed papers without reading them. Berry was not produced as a witness.

Respondent produced as a witness W. G. Cullen, an engineer in the Bureau of Internal Revenue, who at one time had worked on petitioner's tax case in the Bureau and who had prepared the waiver form involved and sent it to the petitioner for signature. Cullen examined the form before it was mailed and initialed it to show that fact. The disputed figure " 7 " was identified by Cullen as having been made by him and as having been made before the form was sent to the petitioner for signature. Cullen's testimony on this point was clear and positive. While he admitted having no positive present recollection of having written the " 7 " over the printed " 6 ", he was certain that it was his " 7 " and he knew that he had made no change in the form after it was received in the Bureau bearing the petitioner's signature. The respondent's second request for a waiver for the years 1920 and 1921 is explained to our satisfaction by the fact of printing the forms on different colored paper for purposes of ready identification. Cullen's testimony on this is supported by the fact that no follow-up letters were sent to petitioner to induce him to sign and return the second form sent out, which indicates, as stated by Cullen, that the respondent's office was of the opinion that it had a waiver which ran until December 31, 1927.

Petitioner produced as a witness a handwriting expert who, after examining the controverted " 7 " in the waiver and the figures " 379 " made by Cullen while on the witness stand gave it as his opinion that the two " 7's " were not made by the same person. The reasons for his conclusion were stated as follows:

The " 7 " in the exhibit of Respondent's Exhibit B [waiver] starts with a stroke that indicates that it comes down, instead of going up—the first stroke,—it is just a small tick,—very small. The topline of the " 7 " ascends higher than the first line,—the down stroke is more even and written with more ease,—the " 7 " in the exemplar [figure 379] starts with an upward stroke—the top of the " 7 " does not have the same tendency to go up,—the down stroke of the " 7 " is uneven and shaky, and there are only two " 7's ". that I have to compare with, and for these reasons I can not associate those two " 7's " together.

For reasons hereinafter given, we are inclined to give but little weight to this testimony. The witness testified that the " 7 " on the waiver was not made by the same person as the ink initials in the upper left corner of the waiver, yet on cross-examination he could not say whether the person who had made the initials had also made the ink figures 1920 and 1921 for the reason, as stated, that " I cannot compare printed letters with written letters." The respondent called a handwriting expert as a witness, who, when asked whether in his opinion the two " 7's " were made by the same person, stated:

\* \* \* The territory you have given me here is too small to form an opinion, and I do not think it is fair to either side to render an opinion on a single " 7 "; I would not certainly do it on a single signature.

Petitioner's witness further testified that in his opinion the " 7 " in the waiver had not been gone over, but was made with one stroke of the pen. Respondent's witness, on the other hand, was of the opinion that the " 7 " had been gone over and was not made with a single stroke. Upon examination of the waiver we agree with the opinion expressed by respondent's witness. There is a strong black line throughout the length of the " 7 " which appears to be superimposed upon a lighter line. This appears quite plainly in both the original waiver and an enlargement of a part of it which was put in evidence by the respondent, and in our opinion it distinctly indicates that the figure was gone over at least once.

Upon careful consideration of all the evidence we are of the opinion that the " 1926 " in the waiver was changed to " 1927 " before the instrument was signed by the petitioner and the waiver was therefore valid to extend the period for assessment to December 31, 1927. Accepting the petitioner's contention that the burden is on the respondent to establish that the alteration was made before the waiver was executed by petitioner, we believe that the burden has been met. Accordingly, the deficiency notice of June 24, 1927, was timely and the deficiency is not barred.

*Petitioner's claim to right of recovery of part of amount paid to collector in June, 1928.*

Petitioner claims that of the $700,000 paid in June, 1928, to the collector he is entitled to recover the $300,000 credited against the assessment for 1917 and the $220,000 credited against the assessment for 1918. This claim is made on the ground that at the time the payment was made the statute of limitations had run. He further contends that the respondent can not avail himself of section 611 of the Revenue Act of 1928 because, (1) the amount of $690,000 out of which he seeks recovery ($10,000 of the $700,000 having heretofore

been refunded) was paid as a part of an offer in compromise, (2) there is no evidence that collection was stayed by the abatement claims in dispute, (3) the abatement claims were not filed by the petitioner, (4) the filing of the claims was not ratified by petitioner, (5) the Commissioner did not personally sign the assessment lists and there was no legal assessment made prior to June 2, 1924. We will consider these claims in the order stated.

Section 607 of the Revenue Act of 1928 provides:

Any tax (or any interest, penalty, additional amount, or addition to such tax) assessed or paid (whether before or after the enactment of this Act) after the expiration of the period of limitation properly applicable thereto shall be considered an overpayment and shall be credited or refunded to the taxpayer if claim therefor is filed within the period of limitation for filing such claim.

The limitation period on collection for 1917 and 1918 had clearly run when in June, 1928, petitioner paid the amount of $700,000 to the collector, and as the waivers given in December, 1928, were specifically limited to collection of the balances of the assessments that remained outstanding after giving credit for the amounts paid in June, they did not serve to extend the time for collection of the full amounts of the assessments. Accordingly, unless section 611 of the Revenue Act of 1928 is a bar, petitioner is entitled to recover $520,000 of the amount paid in June, 1928, which was credited to the assessments for 1917 and 1918.

Section 611 reads:

If any internal-revenue tax (or any interest, penalty, additional amount, or addition to such tax) was, within the period of limitation properly applicable thereto, assessed prior to June 2, 1924, and if a claim in abatement was filed with or without bond, and if the collection of any part thereof was stayed, then the payment of such part (made before or within one year after the enactment of this Act) shall not be considered as an overpayment under the provisions of section 607, relating to payments made after the expiration of the period of limitation or assessment and collection.

Petitioner's first argument against the application of section 611 is that the $690,000 was part of an offer in compromise. The evidence in the case indicates that it was not. Petitioner early in 1928, accompanied by attorney Gilmore, called on attorney Faulkner in the General Counsel's office to see if there was not some way to stop the running of interest on the outstanding assessments. Faulkner advised his callers " that they should go and pay the tax " and that he would recommend an acceptance of an offer in compromise of the interest. Petitioner's version of the conversation is that Faulkner said " you can deposit money in the department at Oklahoma." However, Gilmore, who later accompanied petitioner to the collector's office to learn the collector's attitude toward receiving the payments that petitioner proposed to make, prepared on the regular printed

form issued by the Treasury Department an offer of $10,000 in compromise of interest, and it is difficult to understand, if the larger amount of $690,000 was likewise intended as an offer in compromise, why it was not submitted in an equally formal and careful manner. The testimony of P. G. Rawdon, assistant to the collector, and of Rawdon's secretary, Mary Ann Hays, is quite clear that, at both conferences between petitioner and Rawdon, petitioner stated that he wanted to make certain payments to apply against his tax liability and that only the $10,000 was submitted as a compromise offer. Both Rawdon and Miss Hays testified that the $690,000 was neither offered nor received as a " deposit " in the sense claimed by the petitioner, that the term " escrow " was not used at either conference, and that the only time the term " deposit " entered into the conversation was upon Gillespie's second call, when he and Rawdon agreed that after crediting part of the $690,000 to assessments for the several years the balance should be deposited in the collector's unidentified account pending assessment for 1920. It is also clear from Rawdon's testimony that at the time petitioner submitted the checks he and the petitioner agreed upon the apportionment of the $690,000 to petitioner's tax liability for the several years. In our opinion the amount of $690,000 can not come in in the shadow of the smaller amount of $10,000, and we hold that the amount of $690,000 was a tax payment.

Furthermore, we are inclined to believe that if the $690,000 is not a tax payment, we would have no jurisdiction to decide whether the petitioner is entitled to a refund of it. There is nothing in the statute giving us jurisdiction to say what should be done with compromise offers or deposits made to stop the running of interest as the amount here involved is described by the petitioner.

Petitioner says there is no evidence that collection was stayed by the claims for abatement of the 1917 and 1918 additional assessments, but, on the contrary, it appears that waivers rather than abatement claims stayed the collection. This argument seems to us to be merely an attempt to shift the burden of proof. The taxpayer is here seeking a refund and the duty is upon him to show that the facts in his case bring it within the statute and a lack of evidence to show that collection was actually stayed by abatement claims is not enough to prove his case. Here the facts are that assessments were made, abatement claims were filed, and collection was stayed. These facts make out a prima facie case for the respondent. The sequence of the filing of claims and the stay of collection "suggests a causal connection between them." *Reeves, Inc.* v. *Anderson*, decided by the Circuit Court of Appeals for the Second Circuit. The assistant to the collector, a witness for the respondent, testified that it was the practice of the collector's office in the case of jeopardy assessments to

secure a bond or payment if possible, and that where waivers were demanded and not furnished it was customary to proceed with collection regardless of whether abatement claims were on file or not. This, however, proves nothing as to why collection was stayed in this particular case. In our opinion petitioner has failed to establish that collection was not stayed by the claims in abatement. Cf. *Reeves, Inc.* v. *Anderson, supra.*

Section 611 of the 1928 Act, which is set out above, has been before the Federal courts in a number of cases and there are two distinct lines of decisions. One group holds that the word "stayed" as used in the statute connotes the existence of a state of facts under which the Commissioner was by law or agreement barred from collection of the tax, or as said in *United States* v. *Burden, Smith & Co.* (C. C. A., 5th Cir.), 33 Fed. (2d) 229, it means some act which would "morally or legally tie the hands of the Commissioner." See *Pepsin Syrup Co.* v. *Schwaner* (Dist. Ct. Ill.), 35 Fed. (2d) 197; *Cutcheon* v. *Rafferty* (Dist. Ct., N. Y.), 34 Fed. (2d) 708; *Sugerland Industries* v. *Bass* (Dist. Ct., Tex.), 36 Fed. (2d) 375, all of which follow the *Burden, Smith & Co.* case, *supra.* The cases opposed to these hold that the word "stayed" should be construed to signify a voluntary delay in collection. See *Huntley* v. *Gile* (C. C. A., 9th Cir.), 32 Fed. (2d) 857; *Goodcell* v. *Graham* (C. C. A., 9th Cir.), 35 Fed. (2d) 586; *Wright & Taylor* v. *Lucas* (Dist. Ct., Ky.), 34 Fed. (2d) 328; *Magee* v. *United States* (Ct. Cls.), 37 Fed. (2d) 793; *Gotham Can Co.* v. *United States* (68 Ct. Cls. 749), 37 Fed. (2d) 792; *Regla Coal Co.* v. *Bowers* (Dist. Ct., N. Y.), 37 Fed. (2d) 373; *Rockland & Rockport Line Corp.* v. *Ham* (Dist. Ct., Me.), 38 Fed. (2d) 239; *Reeves, Inc.* v. *Anderson, supra.*

Section 611 is by its terms expressly applicable "if a claim in abatement was filed, with or without bond." The first time that a claim in abatement is mentioned in the revenue acts prior to that of 1924 is in the Act of 1918, where in section 234(a)(14) it is provided that a taxpayer claiming a loss from shrinkage in inventory or from payment of rebates might obtain a stay in payment of tax by filing a claim in abatement accompanied by a bond in double the amount of the tax covered by the claim. Obviously, that provision is not applicable here. In the Act of 1921, section 250(d) provided for giving notice and opportunity to the taxpayer to be heard before assessment of a deficiency, save in jeopardy cases, and that upon assessment of any deficiency determined to be due after notice and hearing collection should be made and that no claim in abatement should be entertained. Subdivision (e) provided that the 5 per cent delinquency penalty should not be applied where the taxpayer was not given the benefits of subdivision (d) and where a

bona fide claim for abatement had been filed within ten days after notice and demand. These, as far as we have been able to determine, are the only instances in which the statutes themselves, prior to the Act of 1924, refer to claims for abatement of income taxes. Despite the lack of specific statutory provision for abatement claims, the Commissioner has entertained such claims while the Acts prior to that of 1924 were in effect and has made provision for such claims in his several regulations. See article 261, Regulations 33; article 1032, Regulations 45 and 62. All of these articles contain language substantially similar to that of article 1032, Regulations 45, as follows:

The filing of a claim for abatement does not necessarily operate as a suspension of the collection of the tax or make it any less the duty of the collector to exercise due diligence to prevent the collection of the tax being jeopardized. He should, if he considers it necessary, collect the tax and leave the taxpayer to his remedy by a claim for refund.

From this it appears clearly that the filing of an abatement claim and the consequent stay of collection was not a right of the taxpayer, but an act of grace on the part of the Commissioner. Congress was well aware of this situation when it enacted section 611 of the 1928 Act, as is shown by the report of the Ways and Means Committee, wherein it said:

Prior to the enactment of the revenue act of 1924, it was the administrative practice to assess immediately additional taxes determined to be due. Upon the assessment, taxpayers were frequently *permitted* to file claims in abatement with the collector *and thus delay collection* until the claim in abatement could be acted upon. (Italics supplied.)

It needs no argument to show that a judicial stay was not contemplated by the statute, as such a stay is prohibited by section 3224 of the Revised Statutes. *Bailey* v. *George*, 259 U. S. 16; *Graham* v. *Du Pont*, 262 U. S. 234. And as pointed out in *Imhoff-Berg Silk Dyeing Co.* v. *United States*, 43 Fed. (2d) 836:

This being the case, it appears only logical to determine that the term "stay" could not have been taken and used, and held to mean a legal stay; viz., a stay brought about by operation of law, for if this were the arrangement, the legislation would have had no appreciable reason for being, since no statute of limitation upon the collection of taxes could have run during the period covered by such stay. Equally true it is that the term "stayed" could not have been intended to mean that the collection of taxes was delayed or postponed by some act of the taxpayer which either morally or legally prevented such collection until the expiration of a prescribed statutory period, for this arrangement could have resulted only from an agreement between the interested parties, and aside from all else, would, in effect, have meant conferring upon a taxpayer power to enjoin the collection of taxes which had been duly assessed against him—a doctrine which is declared forbidden by Rev. Stats., Section 3224, in *Graham* v. *Dupont*, 262 U. S. 234.

In *Oak Worsted Mills* v. *United States*, 68 Ct. Cls. 539; 36 Fed. (2d) 529, it was argued by the taxpayer that there was no provision in law for claims in abatement during the period there involved and that there was nothing in the claim that would, under the law, in any event operate as a stay upon the collection of the tax. The court agreed with that argument and then pointed out that:

To put the construction on the statute contended for by plaintiff requires us to attribute to Congress the absurdity of declaring that unless a stay was brought into effect by an act which did not and could not produce a stay, the statute would not operate and thus the statute would nullify itself.

In our opinion the *Oak Worsted Mills* decision and the other cases above cited taking the same view, correctly interpret section 611 in holding that a legal or compulsory stay is not required to make that section operative, and establish the rule to be followed in the present proceeding.

In the cases above referred to, payment of the unabated portion of the tax was made prior to the enactment of the Revenue Act of 1926. In two cases that have come to our attention payment was made after the enactment of the 1926 Act and before the enactment of the Act of 1928. In *Southern Lumber Co.* v. *United States* (Dist. Ct., West Dist. Ark.), —— Fed. (2d) ——, the tax was paid October 19, 1926, which the court held was after the statute had run. It was held that the taxpayer was entitled to recover on the ground that, under section 1106(a) of the Revenue Act of 1926, not only the remedy, but the very essence of the obligation was destroyed and that section 612 of the Revenue Act of 1928, if applied in such a case, would deprive the taxpayer of property without due process. Further the court points out that section 1106(a) of the 1926 Act prohibits refunds only where the taxpayer " has overpaid " the tax, which language the court says refers to cases where the payment was made before the date of the enactment. In *Wyman, Partridge & Co.* v. *United States*, 41 Fed. (2d) 886, where all the elements enumerated in section 611 of the 1928 Act were present, the payment of the unabated tax was made on August 17, 1926. The court adopted the same view as in the *Southern Lumber Co. case, supra,* holding that the words " has overpaid " in section 1106(a) applies only to cases where payment of an outlawed tax was made before the enactment of the 1926 Act. The court distinguishes the case before it from the *Gotham Can* and *Oak Worsted Mills* cases on the theory that section 1106(a) did not retroactively extinguish the liability and therefore when a taxpayer paid an outlawed tax before passage of the 1926 Act he was merely paying a tax for which a liability existed and the money became the property of the United States, whereas in the payment after the enactment of the 1926 Act

of an amount that was barred, the money paid did not belong to the United States as the liability had been entirely extinguished.

Whatever may be the correct rule where the tax was paid while the Revenue Act of 1926 was in effect, the fact is that in the present case payment was made in June, 1928, after the enactment of the Revenue Act of 1928, and in our opinion the decisions in the *Southern Lumber* and *Wyman, Partridge & Co.* cases are not decisive of the question we have. Section 611 of the Revenue Act of 1928 specifically provides that a tax paid within one year after the enactment of that act, where the other conditions set out exist, shall not be considered an overpayment under the provisions of section 607. It is argued that section 1106 (a) in extinguishing the liability gave the taxpayer a vested right of which he could not be deprived by the Revenue Act of 1928 without violation of the due process clause of the Fifth Amendment. This argument, we think, overlooks the fact that the recovery from the United States of taxes paid is not a matter of right, and proceedings for recovery can only be maintained in such cases and in such manner as specifically allowed by the sovereign. In a case such as the one before us the taxpayer has no vested right to recover an amount paid as taxes, and such remedy as the United States may see fit to give him through Congressional enactment is subject to change or repeal by the same process, as a taxpayer can have no vested right in a remedy granted by Congress. *Collector* v. *Hubbard*, 12 Wall. 1. Even an unauthorized and illegal tax collection may subsequently be ratified by Congress. *United States* v. *Heinzen & Co.*, 206 U. S. 370; *Rafferty* v. *Smith, Bell & Co.*, 257 U. S. 226. It must also be remembered that the provisions we are here considering are part of tax statutes and the due process clause of the Fifth Amendment is not a limitation upon the taxing power of Congress, save in cases where the attempted exercise is so arbitrary and capricious as " to constrain to the conclusion that it was not the exertion of taxation, but a confiscation of property." *Brushaber* v. *Union Pacific R. R.*, 240 U. S. 1. The language of the court in *Regla Coal Co.* v. *Bowers, supra*, in answer to the same argument as is made here is applicable to this case. The court said:

Plaintiff's final contention that inasmuch as the statute had run at the time of the collection, Congress was then and is still without the constitutional power to remove the bar, cannot be sustained. It is well settled that there is no vested right to rely upon a statute of limitation to defeat a debt or other personal obligation; the legislature which imposed the bar may remove it. *Campbell* v. *Holt*, 115 U. S. 620; cf. *Decker* v. *Pouvallsmith Corp.*, N. Y. App., decided Oct. 15, 1929, reported in N. Y. L. J., Nov. 7, 1929, at p. 1. That because of sovereign grace the expiration of the statutory period not only gave the taxpayer a defense but also a right to recover taxes paid thereafter does not, in my judgment, change the result. Nor is this a case like *Davis* v. *Mills,*

194 U. S. 451, or *Danzer* v. *Gulf & S. I. R. R. Co.*, 268 U. S. 633, in which the grant of a right is conditioned upon its being exercised within a prescribed period; for the right of the United States to these taxes existed prior to and independent of the grant of a limitation statute for the repose of a taxpayer.

A brief review of the situation existing when the Revenue Act of 1928 was passed will demonstrate the intent of Congress in enacting section 611. Before the decision in *Bowers* v. *New York & Albany Lighterage Co.*, 273 U. S. 346, decided February 21, 1927, the Commissioner had always supposed that the limitation provisions in the acts prior to that of 1924 did not apply to collection by distraint. After the decision in the *Albany Lighterage* case a great number of refund claims were filed by taxpayers who had previously filed abatement claims and who paid the unabated portions of assessments under threat of distraint after the statute had run. "This situation," as said in *Wright & Taylor* v. *Lucas*, 34 Fed. (2d) 328, "was at its height when Congress came to consider the enactment of the Revenue Act of 1928, and it was to prevent taxpayers taking advantage of the delay occasioned by their having filed claims in abatement that section 611 was enacted." Nor did Congress go further. The delay remained a permanent bar except in those cases where the Treasury's inaction resulted from the taxpayer's demand for a further hearing on his abatement claim. The purpose of section 611 is clearly set forth in the report of the Ways and Means Committee in presenting the bill to the House in the following language:

Prior to the enactment of the Revenue Act of 1924 it was the administrative practice to assess immediately additional taxes determined to be due. Upon the assessment, taxpayers were frequently permitted to file claims in abatement with the collector and thus delay the collection until the claim in abatement could be acted upon. If this practice had not been followed, undue hardship undoubtedly would have been imposed upon the taxpayer. It was supposed that there was no limitation upon the collection by distraint of the amount ultimately determined to be due. However, the Supreme Court has recently held in a case in which the period for assessment expired prior to the enactment of the 1924 Act, that the period for collection was limited to five years from the date on which the return was filed. Decisions upon claims in abatement are being made every day. Amounts have been paid, are being paid, by the taxpayer even though the statute of limitations may have run. Exceptionally large amounts are involved. Accordingly, it is of utmost importance to provide that the payments already made should not be refunded. In order to prevent inequality, it is also provided that the amounts not yet paid may be collected within a year after the enactment of the new Act.

Your Committee appreciates the fact that this provision will probably be subjected to severe criticism by some of the taxpayers affected. However, it must be borne in mind that *the provision authorizes the retention and collection only of amounts properly due, and merely withdraws the defense of the statute of limitations.* If it is determined that the amount paid is in excess of

the proper tax liability, computed without regard to the statute of limitations, such excess will constitute an overpayment which may be refunded or credited as in the case of any other overpayment. [Italics ours.] (Report No. 2, 70th Congress, 1st session, p. 34.)

We have no doubt that it was within the powers of Congress to enact section 611. The cases we have cited and discussed in considering section 506 as well as this section, we believe serve to dispose of all arguments against its validity. All the elements enumerated in that section are present: assessment was made prior to June 2, 1924; claims in abatement were filed; collection was stayed; and payment was made within one year after the enactment of the Act. We are accordingly of the opinion that the payments made by petitioner in June, 1928, are not overpayments within the meaning of section 607, and are not refundable.

The next point argued is that the abatement claims were not filed by petitioner, but by a volunteer without any authority from the petitioner. The claims were signed and sworn to by John D. Freeman as agent for the petitioner. Freeman at that time was not— nor has he been at any time since—petitioner's agent, and obviously he was without authority to execute claims on behalf of the petitioner. At the time Freeman executed the claims, petitioner's tax representative, Charles M. Heltzell, was out of town. The record abundantly establishes that Heltzell was acting for petitioner in tax matters with his knowledge. Heltzell at petitioner's expense came to Washington to see if settlements could be made on petitioner's tax matters; correspondence between the respondent and petitioner clearly shows that Heltzell was acting for the latter with his knowledge and was recognized by the respondent as petitioner's tax representative. It is a well established principle of the law of agency that knowledge on the part of the agent as to a fact within the scope of the agency charges the principal with notice, even though the principal may in reality be ignorant of the fact. *The Hiram*, 1 Wheat. 440; *Smith* v. *Ayer*, 101 U. S. 320, 325; *Armstrong* v. *Ashley*, 204 U. S. 272, 283. Under this rule, when Freeman informed Heltzell of the filing of the claims, petitioner became charged with knowledge of the fact.

Petitioner's testimony is that it was not until June of 1929 that he knew that Freeman had signed the abatement claims and it was not until that time that he knew what abatement claims were. However this may be, as far back as December 10, 1923, respondent's office wrote to the petitioner setting a date for a conference " In connection with your claims for abatement of taxes for the years 1917 and 1918 * * *." On February 16, 1925, petitioner signed

and swore to a document, the heading of which is set forth in the findings of fact, and which specifically referred to the very claims in dispute. In petitioner's offer in compromise, which was also executed under oath, petitioner refers to "the claims in abatement filed for said years in August, 1922." *Owings* v. *Hull*, 34 U. S. 607, 629, cited by petitioner, holds that "If the material facts be either suppressed or unknown, the ratification is treated as invalid, because founded in mistake or fraud." The evidence in this case clearly shows that the facts were not "suppressed or unknown." *Law* v. *Cross*, 1 Black, 533, 539 holds that:

He [the principal] cannot, by holding his peace, and apparent acquiescence, have the benefit of the contract if it should afterwards turn out to be profitable, and retain a right to repudiate it otherwise.

The principal must, therefore, when informed, reject within a reasonable time or be deemed to adopt it by acquiescence.

Where, as here, petitioner's tax representative was informed that the claims had been filed and the claims were referred to in at least one letter to the petitioner, and the petitioner specifically referred to them in documents executed under oath and filed with the respondent, we think the petitioner must be held to have ratified the claims. We think that, after all these years that the claims were on file and after the petitioner obviously had knowledge of them, it is too late for him now to attempt to repudiate them as unauthorized acts.

The remaining contention of petitioner is that the Commissioner did not personally sign the assessment list of July 19, 1922, and consequently there was no legal assessment against the petitioner made prior to June 2, 1924. The assessment list bears the name of the then Commissioner, D. H. Blair. Petitioner called as a witness an employee of the Commissioner's office whose duty it was to place the assessment list before the Commissioner for signature. He had seen Commissioner Blair write his signature a number of times during the eight years he was in the Commissioner's office. Upon examining the signature appearing on the assessment list here involved, this witness testified that he did not know whether Mr. Blair had personally affixed his signature to the list, but stated his belief to be that Mr. Blair had not personally signed it. Assuming that this evidence is sufficient to establish that the Commissioner did not personally sign the assessment list, we are nevertheless of the opinion that the fact does not invalidate the assessment. Petitioner's counsel conceded that the signature was affixed by some one authorized by the Commissioner to sign his name. Sections 321 and 3182 of the Revised Statutes, referred to by the parties, outline the duties of the

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Commissioner, but they do not require those duties to be personally performed by him, nor do they forbid delegation of authority. That it would be physically impossible for the Commissioner to personally carry on the work performed by the entire Bureau of Internal Revenue is obvious. In *Fidelity Title & Trust Co.*, 10 B. T. A. 482, there was a question of whether a letter signed by a Deputy Commissioner, notifying the taxpayer of the determination of additional tax, constituted an assessment. We held that it did not, and said:

> The only person authorized to make an assessment is the Commissioner of Internal Revenue or, under certain circumstances, an Acting Commissioner. While the determination of the amount of any tax must be left in the usual case to others, the action which constitutes the assessment must be the act of the Commissioner. The letter of May 23, 1923, upon which the petitioners rely as constituting an assessment of tax, is not and does not purport to be an action by the Commissioner.

That decision deals with facts entirely different from those in the present case. The act which the taxpayer there claimed to constitute an assessment did not even purport to be the act of the Commissioner. Here the act does purport to be that of the Commissioner and in our opinion the signing of his name by one authorized so to do does not make it any the less his act. *Tameling* v. *Commissioner*, 43 Fed. (2d) 718. Cf. *Diamond Alkali Co.* v. *Heiner*, 39 Fed. (2d) 645; *Marshall Wells Co.* v. *Willcuts*, 41 Fed. (2d) 751.

Summarizing, we find that the statute of limitations has not run against the respondent for the years 1917 and 1918; that the statute has run against assessment and collection of the deficiency determined for 1919. We further find that, under section 611 of the Revenue Act of 1928, petitioner is not entitled to a refund of any of the amount paid to the collector in June, 1928, and applied against 1917 and 1918 assessments; that the bar of the statute had not fallen against collection of the assessment for 1919 made prior to June, 1928, and petitioner is not entitled to recover the amount paid at that time and credited against the assessment for 1919. We further find that the respondent's deficiency notice for the year 1920 was timely and that the statute has not run against assessment and collection for that year.

Reviewed by the Board.

> *The proceedings will be restored to the general calendar for hearing on the merits in due course.*

MURDOCK concurs in the result only.